**STATE OF TEXAS**

v.

**SECRETARY OF the INTERIOR, et al.**

**Civ. A. No. B–79–476–CA.**

United States District Court,
E.D. Texas,
Beaumont Division.

Feb. 15, 1984.

Hubert Oxford of Benckenstein, Oxford, Radford & Johnson, Beaumont, Tex., for State of Tex.

Margret Strand, Washington, D.C., for Dept. of Interior.

## MEMORANDUM OPINION AND ORDER

**ROBERT M. PARKER, District Judge.**

This case concerns distribution of lease revenue derived from certain federal, offshore lands situated in the Gulf of Mexico. The State of Texas and the Department of Interior are the primary litigants. The parties agree that Section 1337 of the Outer Continental Shelf Lands Act (OCSLA), 43 U.S.C. §§ 1331–1356, is controlling in this case. More specifically, they agree that Section 1337[1] provides a standard for distribution of the lease revenue in question. They do not, however, agree regarding the correct construction of that standard or its application to the lease sales involved in this case. No other court has passed on the issues this Court confronts today.

Of central importance to this litigation, Section 8(g), as amended by the Outer Continental Shelf Lands Act Amendment of 1978[2] designated as a distinct area federal offshore lands lying within three miles of the seaward boundaries of the coastal states. Conceptually, two separate zones comprise federal, offshore lands; first, the 8(g) zone, *i.e.,* the inner most three mile strip of federal offshore land which lies immediately adjacent to state owned offshore lands, and second, the non-8(g) zone, *i.e.,* federal, offshore lands lying seaward of the 8(g) zone.

In addition to creating the 8(g) zone, the 1978 Amendment provided both procedural and substantive guidelines for leasing tracts located in the 8(g) zone. In brief, these provisions require the following: at the time the Secretary solicits nominations for lease bids[3] on tracts within the 8(g) zone, he must provide relevant geographical, geological and ecological information to the Governors of those coastal states which own offshore lands adjacent to the federal lands being nominated.[4] Moreover, the Secretary must offer the Governor of the relevant coastal state an opportunity to enter into an agreement concerning disposition of revenue generated by federal leasing of tracts in the 8(g) zone if they contain at least one oil or gas pool or field common to both federal and state lands. The Governor then has 90 days within which to decide whether to accept the offer. Even if no such agreement can be reached, the Secretary may lease the federal tracts. But, he must deposit in a separate treasury account all lease revenues attributable to tracts in the 8(g) zone which contain an oil or gas pool common to both federal and state submerged lands. Thereafter, if the Secretary and Governor still are unable to agree upon the proper distribution of lease revenue, the matter may be submitted to a United States' district court for a determination of "the *fair and equitable* disposition of such revenues and any interest which has accrued and the proper rate of payments to be deposited in the treasuries of the Federal government and the coastal state." 43 U.S.C. § 1337(g)(4).

---

1. Section 205(b) of Public Law 95–372, 92 Stat. 634, amended section 8 of the Outer Continental Shelf Lands Act of 1953, 67 Stat. 462. Hereinafter, the Court will refer to 43 U.S.C. § 1337 as Section 8, as the parties have throughout the trial, briefs and memoranda.

2. Pub.L. 94–372, Sept. 18, 1978; 92 Stat. 634.

3. The first step in the federal OCS leasing process is the request for nominations, *i.e.* a request for expressions of interest 43 U.S.C. § 1344(f)(1) (Supp. III 1979). *See also* 43 C.F.R. Part 3300 (procedures involved in preparing for a lease sale).

4. 43 U.S.C. § 1337(g)(2).

The dispute which gave rise to the instant litigation arose almost immediately after Congress amended the OCSLA in 1978. In September, 1978, the Secretary proposed a lease sale which included several tracts located within the 8(g) strip adjacent to Texas, but later withdrew these tracts from the sale when requested to do so by the Governor of Texas. Subsequently, the Secretary included the previously withdrawn 8(g) tracts in the list of tracts comprising two other proposed lease sales which were scheduled for July and November, 1979. Prior to the actual lease sales, in April and June of 1979, the parties pursued resolution of their differences through negotiation. As the date designated for the first of these lease sales drew near, still unable to reach an agreement with the Secretary, Texas filed suit seeking to enjoin Lease Sale 58 [5]. After reviewing the briefs and hearing argument on Texas' Motion for a Temporary Restraining Order, this Court denied Texas' request, but retained jurisdiction in the case.[6] Lease Sale 58 proceeded on schedule. The Secretary did, however, deposit all lease revenue attributable to tracts located within the 8(g) strip in a separate treasury account. Again the parties attempted to resolve their differences through negotiation but again they failed. Accordingly, as provided by section 8(g), this Court must now determine the fair and equitable disposition of revenue attributable to tracts lying within the 8(g) zone.

Central to the parties' dispute is their conflict regarding interpretation of the legal standard contained in Section 8(g). Section 8(g)(4) provides in its entirety:

Notwithstanding any other provision of this subchapter, the Secretary shall deposit in a separate account in the Treasury of the United States all bonuses, royalties, and other revenues attributa-

ble to oil and gas pools underlying both the outer Continental Shelf and submerged lands subject to the jurisdiction of any coastal State until such time as the Secretary and the Governor of such coastal State agree on, or if the Secretary and the Governor of such coastal State cannot agree, as a district court of the United States determines, *the fair and equitable* disposition of such revenues and any interest which has accrued and the proper rate of payments to be deposited in the treasuries of the Federal Government and such coastal State (emphasis added).

Essentially, Texas argues that the statutory language requires a district court to engage in a broad review, *i.e.*, a totality of the circumstances type examination, to determine what is a *"fair and equitable"* distribution of revenue. By contrast, the Secretary urges this Court to conclude that the statute mandates a far more limited role for a district court, that the *"fair and equitable"* standard is based upon a single factor; *i.e., drainage*—production of State resources through wells drilled by federal leases. At stake in this litigation is over one billion dollars of lease revenue attributable to tracts in the 8(g) zone.[7]

Because construction of the fair and equitable standard is a question of law, defendant, on October 16, 1981, filed a Motion for Partial Summary Judgment. By an order entered October 14, 1981, this Court granted defendant's motion, in part, and carried the remaining questions with the trial. On October 23, 1981, plaintiff filed a Motion to Reconsider the Court's Order of October 14, 1981. After thoroughly reviewing the parties' motions and supporting briefs, the voluminous legislative history, the statute, and after nine days of trial, the Court has concluded that disposition of

---

**5.** Texas filed its Motion for a *Temporary Restraining Order* on July 27, 1979. Lease Sale 58 was scheduled for July 31, 1978.

**6.** Louisiana also filed suit, the same day, seeking to enjoin Lease Sale 58. The United States District Court for the Eastern District of Louisiana denied the motion. *Louisiana v. Andrus,*

No. 79–22965 (E.D.La. July 30, 1979). The Fifth Circuit Court of Appeals denied a petition for writ of mandamus, thereby effectively affirming the Louisiana District Court. *In re Louisiana,* No. 79–2785 (5th Cir. July 31, 1979).

**7.** *See infra* Findings of Fact No. 3.

federal lease revenue, pursuant to Section 8(g)(4), is not limited to compensation for drainage. Accordingly, plaintiff's Motion to Reconsider is granted, and lease revenue attributable to tracts in the 8(g) zone shall be distributed as set forth in the Court's Findings of Fact.

## I. *History and Experience* [8]

The roots of this long and labyrinthine litigation extend to several seemingly remote events which took place at mid-century. During the first forty-five years of this century, coastal states exercised jurisdiction over offshore mineral resources. California, Texas, and Louisiana all executed leases permitting development and production of offshore oil and gas resources. This changed, however, when in 1945, by Proclamation and Executive Order,[9] President Truman asserted *exclusive* federal jurisdiction over all "the natural resources of the subsoil and sea bed of the continental shelf ... contiguous to the coasts of the United States ...." [10] Over the next eight years ownership of offshore lands changed hands three times—from State to Federal and, in part, back again.

Unwilling to accept the impact of exclusive federal jurisdiction over offshore mineral resources—*e.g.*, reduction in state revenues, loss of control over activity which affects state landscapes and seascapes—coastal states challenged the Truman Proclamation in court. Three times between 1947 and 1950, the Supreme Court rejected state claims to offshore mineral resources.

In *United States v. California*, 332 U.S. 19, 67 S.Ct. 1658, 91 L.Ed. 1889 (1947), the first case in which it confronted federal-state conflicts over ownership of offshore resources, the Supreme Court held "that the Federal Government rather than the State has paramount rights in and power over [the continental shelf] ..., an incident to which is full dominion over the resources of the soil under that water area, including oil." *Id.* at 38–39, 67 S.Ct. at 1668. In two 1950 decisions, the Court extended the *California* rationale to lands underlying the Gulf of Mexico off the coasts of Texas and Louisiana. *United States v. Texas*, 339 U.S. 707, 70 S.Ct. 918, 94 L.Ed. 1221 (1950); *United States v. Louisiana*, 339 U.S. 699, 70 S.Ct. 914, 94 L.Ed. 1216 (1950). These rulings effectively eviscerated coastal states' claims to ownership of offshore resources.

Not satisfied with the Supreme Court's tripartite judicial rebuke, the Coastal States carried their cause into the political arena. The Outer Continental Shelf Lands Act (OCSLA), 43 U.S.C. § 1331, and the Submerged Lands Act (SLA), 43 U.S.C. §§ 1301–1315, represent the political solution to the dispute over ownership of offshore lands which by 1953 had been labeled the Tidelands controversy. The SLA embodies a Congressional determination that the public interest required "title to and ownership of the lands beneath navigable waters within the boundaries of the respective States, [to be] ... vested in and as-

**8.** As Justice Frankfurter observed with one of his characteristic flashes of insight, in some instances when construing statutes "[h]istory and experience outweigh claims of virgin analysis...." *Andres v. United States*, 333 U.S. 740, 757, 68 S.Ct. 880, 888, 92 L.Ed. 1055 (1948) (Frankfurter, J., concurring). This is such a case because complete comprehension of the OCSLA requires a historical review of federal-state conflicts related to offshore resource ownership.

**9.** Proclamation No. 2667, 10 Fed.Reg. 12,303 (1945). On the same day, President Truman issued Exec. Order No. 9633, 3 C.F.R. 437 (1945). By this order, the President vested in the Secretary of the Interior nearly unlimited

discretion to manage OCS development, pending enactment of legislation. The 1953 Tidelands Acts did not alter significantly the degree of discretion exercised by the Secretary.

**10.** *Id.* The Submerged Lands Act defined original coastal states' seaward boundaries as a line running parallel to but three geographical miles distant from its coast line..." 43 U.S.C. § 1312. For States admitted after formation of the Union, the seaward boundary extended beyond three geographical miles if the State's laws or Constitution so provided prior to admission to the Union. 43 U.S.C. § 1312. For Texas, this resulted in a geographical border of three marine leagues, i.e., approximately ten and one-half miles.

signed to the respective States ...."[11] Thus, incident to their statutorily vested ownership, the States acquired "the right and power to manage, administer, lease, develop, and use ... [the submerged land] and [its] natural resources."[12] Thus, less than a decade after executive and judicial determinations that coastal states did not possess any ownership interest in offshore mineral resources, Congress had, in part, restored coastal states to the position they had been in prior to the Truman Proclamation. Congress, however, explicitly reaffirmed federal jurisdiction, power, and control over the outer Continental Shelf, *i.e.*, that portion of the Continental Shelf lying seaward of State owned offshore lands. 43 U.S.C. § 1332(a).

Of primary significance to the instant litigation, the OCSLA and SLA narrowed, but failed to eliminate, federal-state conflicts concerning ownership of offshore resources. These Acts merely shifted the focal point of the conflict from the issue of which sovereign, state or federal, owned all offshore resources to issues related to the newly created common border separating federal and state offshore lands. Juxtaposition of ownership interests naturally gives rise to conflicts over ownership. *United States v. Louisiana*, 446 U.S. 253, 100 S.Ct. 1618, 64 L.Ed.2d 196 (1980), provides a paradigm of this phenomenon.[13]

But the potential for such "border disputes" was not unforeseen by Congress. To the contrary, Congress anticipated jurisdictional disputes and included within the OCSLA a mechanism for resolving them.[14]

With one minor exception,[15] the Tidelands Acts of 1953 remained intact, unamended, for the next twenty-five years. The dearth of amendments can be attributed to the absence of any significant perceived need for alteration of the Tidelands Acts. Because OCS development was limited in scope, involving limited acreage in concentrated[16] geographical areas principally in the Gulf of Mexico, federal offshore development aroused little controversy.

More recently, however, several factors coalesced to cause an explosion in the rate of OCS development and concomitantly to underscore the inadequacy of existing federal regulation of offshore leasing. First, the blowout of an OCS drilling project in the Santa Barbara Channel off the coast of California, on January 28, 1969, resulting in a massive oil spill with attendant environmental damage, heightened awareness of environmental risks linked to OCS development. Second, by permitting exploration and development of geological structures located at greater depths, farther from shore, the advent of advanced technology provided an indispensible foundation supporting expanded OCS development.[17] Finally, the Arab oil embargo of 1973 powerfully underscored the need for energy independence and acted as a catalyst, causing acceleration of OCS development.

11. 43 U.S.C. § 1311(a).

12. 43 U.S.C. § 1311(a).

13. Determination of the precise location of a state's coastline is one of the problems generated by contiguous state-federal ownership of offshore lands. The Supreme Court has adopted the *International Convention on the Territorial Sea and the Contiguous Zone*, ratified by the United States in 1961, [1964] 15 U.S.T. (pt. 2) 1607, T.I.A.S. No. 5639, as a means of defining the seaward limit of inland waters, but still disputes over the exact seaward boundary of Louisiana arose and were referred to a Special Master for resolution. *See United States v. Louisiana*, 446 U.S. 253, 258, 100 S.Ct. 1618, 1622, 64 L.Ed.2d 196 (1980).

14. *See* 43 U.S.C. § 1336.

15. The Deepwater Port Act, Pub.L. 93–627, § 19(f), 88 Stat. 2146 required continual updating of State laws applicable to OCS operations.

16. H.R.Rep. No. 590, 95th Cong., 1st Sess. 65, 74 (1977), reprinted in 1978 U.S.Code Cong and Admin.News 1450, 1472, 1481. The vast majority of leasing occurred in the Gulf of Mexico. *Id.* at 65. Consequently, leases in the Gulf accounted for nearly 70 percent of offshore oil production and 95 percent of offshore natural gas production.

17. *See* Murphy & Belsky, *OCS Development: A New Law and a New Beginning,* 7 Coastal Zone Mgmt. J. 297, 300–01 (1980).

Responding to its abruptly unveiled dependence on foreign oil, the United States looked to increased offshore production as a means of solving its energy problems. In 1973, and again in 1974, President Nixon directed the Department of Interior to accelerate substantially OCS leasing. For 1975 alone, he ordered 10 million acres to be leased, nearly as much acreage as had been leased previously, during the entire twenty-two year history of the OCS program.[18] Significantly, the expanded OCS leasing included tracts in virgin, frontier areas off the Atlantic, Pacific, and Alaskan coasts.[19] This fact coupled with all too common, highly publicized, environmental disasters,[20] engendered extraordinary public opposition to extention of OCS development to new regions.[21]

To summarize, by the early 1970s, two vital national concerns—environmental protection and the need for energy independence—were competing for higher ranking among the list of national priorities. Moreover, the same events which brought this competition to the fore also revealed significant structural flaws in the statutory and regulatory framework through which quickly expanding OCS leasing would proceed.

Foremost among these deficiencies was lack of a mechanism for promoting federal-state cooperation regarding OCS leasing, which profoundly affects coastal states in numerous ways. By way of illustration, environmentally, state beaches, shoreline areas and estuaries are damaged by blowouts like the one off the coast of Santa Barbara; economically, state onshore land provides sites for support facilities, e.g., refineries and pipelines. Moreover, it is the states' coastal communities which suffer economic side effects as a result of sudden fluctuations in total aggregate income, so-called "boom town" effects. Notwithstanding the myriad environmental and economic impacts on coastal states, the OCSLA conferred upon the Secretary of Interior nearly unlimited discretion regarding OCS leasing issues leaving the states with no means to provide input into policies which seriously impacted upon them.[22]

One result of this separation of impact and control had been strained federal-state relations. Often, states manifested their opposition to and frustration with OCS leasing policies by attempting to derail federal OCS leasing plans. For example, California enacted legislation banning the laying of pipelines across state waters to onshore facilities, thereby reducing the economic feasibility of development on the OCS.[23] More commonly, states employed litigation as a means for delaying OCS development: By increasing risk and raising doubts in potential lessees' minds, the mere threat of litigation retarded federal efforts to extend OCS leasing.[24] In sum, continuing federal-state conflict arrested expansion of OCS development. Thus, restructuring the OCSLA to include mechanisms for increased federal-state coopera-

18. H.R.Rep., *supra* note 16, at 74–75, 94.

19. *Id.* at 100. Beginning with President Nixon's Project Independence, every administration has accelerated progressively OCS development. Note, *The Seaweed Rebellion: Federal-State Conflicts Over Offshore Oil and Gas Development,* 18 Willamete L.Rev. 535, 538 (1982); *See also* J. Whitaker, Striking a Balance—Environmental and Natural Resources Policy in the Nixon-Ford Years 259 (1975).

20. *See* Murphy & Belsky, *supra* note 17, at 301, 322 n. 18–19.

21. In addition to the Santa Barbara blow out, in September 1969, a barge spilled 100,000 gallons of home heating oil near Falmouth, Mass. thereby poisoning marine life. Similarly, in December, 1976, the *Olympic Games,* a Liberian Tanker, ran aground spilling 133,400 gallons of crude oil into the Delaware River. The North Sea blowout, on April 22, 1977, which resulted in a 300 square mile oil slick provides yet another graphic illustration of the environmental dangers associated with OCS development. H.R. Rep. N. 590, *supra* note 16, at 75–87, 107–10.

22. States on both the Atlantic and Pacific coasts resorted to court action on numerous occasions in an attempt to halt proposed OCS lease sales. *See, e.g., California v. Watt,* 668 F.2d 1290 (D.C. Cir.1981).

23. H.R.Rep. no. 590, *supra* note 16, at 80.

24. *Id.* at 89–90.

tion was a necessary prerequisite to increased OCS production and movement toward energy independence.

Cognizant of the statutory inadequacies exposed by repeated environmental calamities, the urgent need for energy independence, and persistent federal-state confrontation, Congress began considering corrective legislation. In 1974, the Senate passed legislation, but not until four years later did both Houses of Congress agree on legislation amending the OCSLA. The vicissitudes of the amendments' legislative voyage need not be recounted here. Suffice it to note, the 1978 amendments are the product of diligent and exacting congressional effort. Various congressional committees participated; multitudinous on site investigations and hearings were held; other nations' offshore energy development policies were reviewed; and the proposed amendments were the subject of extensive floor debate.[25]

By enacting legislation which comprehensively overhauled the existing OCS process, Congress intended to achieve a statutory framework which would balance competing national interests. Specifically, Congress intended to foster expedited development while simultaneously reducing environmental hazards. Moreover, Congress hoped to reduce the level of federal-state disharmony.[26]

To abate federal-state dissonance, the 1978 amendments completely restructured federal-state roles related to OCS development. Emphasizing cooperation rather than confrontation, the amendments sharply curtailed the Secretary's previously, virtually unlimited discretion, and concomitantly provided for substantially increased participation by affected states.[27] The statutorily required five-year leasing program designating the size, timing, and location of leasing activity provides an illustration of the restructured federal-state roles. The Secretary *must* solicit recommendations from the Governor of any state which may be affected by the leasing program.[28] Moreover, he *must* accept such suggestions if "they provide for a reasonable balance between the national interest and the well-being of the citizens of the affected State."[29]

Another integral component of the 1978 amendments addresses problems associated with the existence of a common border separating federal and state offshore property, and it is this provision of the Amendments with which the Court is concerned in the instant case. Section 8(g) "establish[es] a procedure for the orderly and efficient leasing and development of Federal Outer Continental Shelf lands contiguous with state tidelands."[30] It provides a multistage process for leasing federal tracts within three miles of the seaward boundary of any coastal state, and as noted above, this three mile strip comprises the 8(g) zone.

Section 8(g) prescribes four distinct stages for leasing tracts located in the 8(g)

25. *See id.* at 95–102; *see also* Murphy & Belsky, *supra* note 17, at 301–07.

26. 43 U.S.C. § 1332. Congress announced several goals interrelated with the general statutory purposes mentioned in the text. These include:
   a. preservation of competition in OCS development;
   b. ensuring to the public a fair and equitable return on OCS resources;
   c. providing economic assistance to coastal states to alleviate onshore impacts of OCS development;
   d. providing States with an opportunity to participate in decisions regarding management of OCS resources;
   e. reduction of conflicts between OCS oil and gas development and recovery of other marine resources, i.e. fishing;
   f. creation of an oil spill liability fund to facilitate prompt cleanup of oil spills attributable to OCS activity and to pay for damages to public or private interests;
   g. creation of a fisherman's contingency fund.
   43 U.S.C. § 1802.

27. *See* 43 U.S.C. §§ 1334(a), 1344(c)(d), 1345, 1351(a)(f)(g), 1352(d); H.R.Rep. 590, *supra* note 15, at 102–03, 115, 119, 152–53.

28. 43 U.S.C. § 1344(c).

29. 43 U.S.C. § 1345.

30. H.R.Rep. No. 590, *supra* note 15, at 144, U.S.Code Cong. & Admin.News 1978, p. 1550.

zone. Each stage possesses both procedural and substantive elements. They are:

1. *The Solicitation Stage* —at the time he solicits nominations for tracts in the 8(g) zone, the Secretary must provide to the Governor of any coastal state, adjacent to the federal 8(g) tracts nominated for sale, a prodigious quantity of relevant information; [31]

2. *Determination Stage* —after receiving nominations for tracts in the 8(g) zone and, after conferring with the Governor of the adjacent coastal state, the Secretary must determine whether any such area *may* contain one or more oil or gas pools or fields common to both federal and state lands.

3. *The Offer Stage* —If the Secretary selects for leasing one or more tracts which may contain a common geological structure, he must offer to the Governor of any adjacent coastal state a proposal for the *"fair and equitable"* division of all revenue which may be generated by a Federal lease of any tracts in the 8(g) zone; [32]

4. *Post-Offer Stage* —The Governor has 90 days within which to respond to the Secretary's offer,[33] and as with contracts in general he has two alternatives—acceptance or rejection.[34]

a. *acceptance* —If the Governor accepts the Secretary's offer, leasing of the 8(g) tracts proceeds in accordance with the terms of the agreement, the provisions of the OCSLA, applicable regulations and, when possible, with the law of the coastal state.[35]

b. *rejection* —Even if the Governor rejects the Secretary's offer leasing of the 8(g) tracts proceeds,[36] but the Secretary must "deposit in a separate account in the Treasury of the United States all bonuses, royalties, and other revenues attributable to oil and gas pools [common to both federal and state lands] ..." [37]

Section 8(g) also provides a mechanism for resolution of disagreements concerning proper distribution of federal lease revenue generated by 8(g) tracts. In the first instance, postlease negotiation between the Governor and the Secretary is permitted but not mandated. If, however, they are unable to agree, the matter may be submitted to a United States district court.[38] The district court must then determine "the *fair and equitable* disposition of such revenues and any interest which has accrued and the proper rate of payments to be deposited in the treasuries of the Federal Government and such coastal State." [39]

## THE INSTANT CASE

Distribution of revenue generated by several offshore lease sales,[40] containing tracts in the 8(g) zone, is at issue in the instant litigation. In the spring of 1979, Secretary Andrus initiated consultations with Governor Clements of Texas regarding then impending lease sales 58 and 58A both of which contained numerous tracts, some of which, at least in part, are located within the 8(g) zone.[41] These lease sales,

---

31. 43 U.S.C. § 1337(g)(1).

32. 43 U.S.C. § 1337(g)(2). Only potential existence of a common pool or field is required. Thus, the remaining stages of the 8(g) process are triggered absent a definitive determination that such common geological structures exist.

33. 43 U.S.C. § 1337(g)(3).

34. The governor may, of course, extend a counter-offer, but if the Secretary rejects such a counter-offer, the process is at the same point it would have been had the Governor rejected the Secretary's offer: the lease sale proceeds uninhibited; negotiations may also proceed; all lease revenues are deposited in a separate treasury account; and the conflict may be submitted for resolution to a United States district court.

35. *Id.*

36. *Id.*

37. 43 U.S.C. § 1337(g)(4).

38. *Id.*

39. *Id.*

40. *See infra* Finding of Fact Nos. 1–2.

41. Some tracts are not entirely within the 8(g) zone. *See infra* Finding of Fact No. 7. To the extent these tracts extend beyond the 8(g) zone they are beyond this Court's jurisdiction in the sense that this Court cannot distribute federal revenue attributable to non-8(g) lands. The

as well as two others, occurred during the pendency of this litigation but prior to the trial—two sales in 1979, one in 1980, and another in 1981.[42] At the core of this vortical litigation is the revenue attributable to these 8(g) tracts, an amount exceeding 1.2 billion dollars.[43]

From the time Congress enacted the Outer Continental Shelf Lands Act Amendment, in September 1978, successive Texas Governors and successive Secretaries of Interior have held conflicting views regarding the Amendment's impact and requirements. Initially, these conflicting views were expressed in correspondence between Texas Governor Clements or Bob Armstrong, Commissioner of the General Land Office[44] and Secretary of Interior Andrus. Even at that embryonic stage of the events which culminated in this litigation, the parties' respective positions were taking form. Prior to lease sales 58 and 58A, in negotiations regarding a potential revenue distribution agreement, the Secretary asserted that absent a pooling agreement there could be no agreement for division of the federal revenue generated by leasing in the 8(g) zone. (Letter of April 27 from Secretary Andrus to Governor Clements, Plaintiff's Amended Complaint, Ex. I) Commissioner Armstrong, responding on behalf of Governor Clements, stated:

> In our view, sections 8(g)(2) and (4) of the OCS Lands Act, as amended, require the Federal Government to share with the States, bonuses, royalties and other revenues derived from Federal leases or pools or fields underlying both State and Federal lands ... in a respective proportion to be negotiated. [Letter of June 5, 1979, from Bob Armstrong to Secretary Andrus, Plaintiff's Amended Complaint, Ex. K].

As mentioned above, these negotiations proved to be futile.

On July 27, 1979, Texas filed suit seeking injunctive relief, claiming that the Secretary had failed to comply with the procedural requirements of section 8(g). Specifically, that he had failed: 1) to provide certain information; 2) to consult with the Governor regarding designation of common pools or fields, or 3) to offer the Governor an agreement for a *"fair and equitable"* disposition of lease revenues. This Court denied the request for injunctive relief holding that Section 8(g)(4) provides an adequate if not exclusive remedy; that petitioner-plaintiff had failed to establish either a substantial threat of irreparable injury or a substantial likelihood of success. The Court, however, retained jurisdiction pursuant to Section 8(g)(4).[45] Thereafter, the Secretary proceeded with lease sale 58. Additional negotiations were inutile, and the litigation proceeded.

In an attempt to refine the issues for trial, on September 24, 1981, defendants filed a Motion for Partial Summary Judgment. Defendants sought the following three findings: 1) that drainage of state resources by federal lessees is the sole

Court has taken this factor into consideration in formulating the fair and equitable division of revenue attributable to tracts part within and part without the 8(g) zone. For future lease sales involving such tracts, the Secretary should deposit in the escrow account *all* revenue attributable to such tracts because in the absence of an agreement between the Secretary and Governor the determination of what percentage of revenue is attributable to the 8(g) portion of a particular tract is a finding of fact appropriately made by the Court. Nevertheless, the Secretary can avoid this eventuality altogether merely by drawing the tract lines so that none are part within and part without the 8(g) zone.

**42.** *See infra* Finding of Fact No. 1.

**43.** *See infra* Finding of Fact No. 3.

**44.** The General Land Office is the Texas agency charged with responsibility for administering the public lands of the State of Texas. As Commissioner of the General Land Office, Mr. Armstrong served as a member of the School Land Board which sets policy for land management, *i.e.* it determines when sales are held, what royalties are charged and whether to approve pooling or unitization agreements. The School Land Board's responsibility includes setting policy for Texas submerged, offshore lands. *Cf.* Tex. [Natural Resources] Code Ann. §§ 32.001–32.111 (Vernon 1978).

**45.** Order of July 30, 1979, Vol. 95 Civ. Order Book P. 11 (1979).

criterion for dividing Section 8(g) lease revenue; 2) that the Secretary had complied with the Section 8(g) procedural requirements; and 3) that the sole remedy available pursuant to Section 8(g) is deposit of lease revenue in an escrow account and subsequent division of it pursuant to the standards set forth in Section 8(g).

By order of October 14, 1981, this Court granted the motion, in part, finding drainage is the proper standard for division of Section 8(g) lease revenue; denied the motion, in part, insofar as the issue of the Secretary's compliance with the procedural requirements of Section 8(g) was raised; and deferred the motion, in part, regarding the exclusivity of remedy issue.

Subsequently, two actions combined to circumscribe the breadth of this litigation. First, in September 1981, plaintiff filed a Second Amended Complaint which significantly narrowed the scope of the issues. In its Second Amended Complaint, the State of Texas limited its claim of procedural violations of Section 8(g), asserting only that the Secretary had failed to make valid offers for a *"fair and equitable"* division of revenue. Moreover, this new complaint eliminated plaintiff's previous request for nullification or injunction of federal OCS lease sales. Second, plaintiff filed a Motion to Reconsider this Court's October 14, 1981 order granting, in part, defendant's Motion for Partial Summary Judgment.

Essentially, then, as distilled through the legal process, the bounds of this litigation have been reduced to a two step analysis involving a single, albeit complex, legal issue and a single, though detailed, factual determination. Initially, the Court must determine whether Section 8(g) narrowly limits a *"fair and equitable"* disposition of federal lease revenue attributable to tracts in the 8(g) zone to considerations of drainage. Thereafter, the Court must make all factual determinations necessary for application of Section 8(g) to the case at bar.

### THE PARTIES' CONTENTIONS

Both parties have advanced multitudinous arguments to support their respective interpretations of Section 8(g). Their contentions can be summarized as follows: Plaintiff asserts that the Section 8(g) *"fair and equitable"* standard requires district courts to weigh numerous factors when dividing lease revenue attributable to tracts located within the 8(g) zone. Plaintiff has listed three such factors which are illustrative. First, plaintiff urges the Court to consider on-shore economic impacts of offshore development. Second, plaintiff argues that the Court should weigh any enhancement in the value of the federal tracts that has occurred because of prior State offshore leasing. Third, plaintiff asserts the Court should divide 8(g) lease revenue in a manner which compensates Texas for any drainage by federal lessees. Defendants assert that the Section 8(g) *"fair and equitable"* standard is narrow and permits district courts to consider only a single factor, drainage of oil and gas from beneath state lands, when dividing 8(g) lease revenue.

### ANALYSIS

■ The question before the Court is a narrow one of statutory interpretation requiring the Court to construe Section 8(g). As previously noted, this is the first case in which a court has been called upon to interpret Section 8(g). In determining the scope of a statute, the starting point is the language of the statute itself. *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 756, 95 S.Ct. 1917, 1935, 44 L.Ed.2d 539 (1975) (Powell, J., concurring). Absent ambiguous language or "a clearly expressed legislative intent to the contrary, that language must ordinarily be regarded as conclusive." *Consumer Product Safety Commission v. G.T.E. Sylvania,* 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980). Moreover, an interpretation that leads to absurd results which would thwart congressional purposes is to be avoided. *Trans Alaska Pipeline Rate Cases,* 436 U.S. 631, 643, 98 S.Ct. 2053, 2061, 56 L.Ed.2d 591 (1978). At bottom, effectuation of congressional purpose is the ultimate end to which all principles of statutory construction are directed. *See*

*Addison v. Holly Hill Co.,* 322 U.S. 607, 618, 64 S.Ct. 1215, 1221, 88 L.Ed. 1488 (1944).[46]

Section 8(g) provides in relevant part:

(4) Notwithstanding any other provision of this subchapter, the Secretary shall deposit in a separate account in the Treasury of the United States all bonuses, royalties, and other revenues attributable to oil and gas pools underlying both the outer Continental Shelf and submerged lands subject to the jurisdiction of any coastal State until such time as the Secretary and the Governor of such coastal State agree on, or if the Secretary and the Governor of such coastal State cannot agree, as a district court of the United States determines, the *fair and equitable* disposition of such revenues and any interest which has accrued and the proper rate of payments to be deposited in the treasuries of the Federal Government and such coastal State (emphasis added).

The term *"fair and equitable"* provides the standard by which federal courts are to determine the disposition of federal OCS lease revenue attributable to oil and gas pools underlying both the outer continental shelf and state offshore lands. Though used more than once in the OCSLA, *see, e.g.,* § 1802(2), *"fair and equitable"* is not listed among the seventeen terms defined in the statutory glossary provided in Section 1331.[47] Accordingly, the Court must look to contextual indicia of meaning to determine which criteria are embodied within the term *"fair and equitable."*

Section 8(g) contains no restrictions upon the term *"fair and equitable."* On its face, the term evokes notions of traditional equity jurisprudence, and therefore suggests that courts, in complying with the

statutory requirement to divide lease revenue in a *"fair and equitable"* manner, should engage in a broad totality of the circumstances inquiry weighing all relevant facts and circumstances; it no more excludes considerations of tract value enhancement or lease bonus windfall to the Federal government than it does considerations of drainage of state resources. Moreover, had Congress intended to limit Section 8(g) solely to drainage, presumably, it would have included some express textual reference to this criterion, particularly to its supposed exclusivity; it could have easily narrowed the latitude afforded district courts by inserting a single short clause, *e.g.,* "to compensate States for drainage of oil and gas from their lands" after the existing language *"fair and equitable"* disposition of such revenues and any interest which has accrued...." But Congress included no such limitations.[48]

Examination of both an earlier legislative enactment and the OCSLA, as originally enacted in 1953, demonstrates that Congress possessed a vast oil and gas vocabulary which it could have employed to limit Section 8(g). The Alaskan Claims Settlement Act (ACSA), Pub.L. 92–203 (1971), 85 Stat. 688, codified at 43 U.S.C. §§ 1601–1624, best illustrates this. Seven years prior to passage of the OCSLA Amendment, Congress enacted the ACSA to achieve a "settlement of all claims by Natives and Native groups of Alaska, based on aboriginal land claims;" 43 U.S.C. § 1601(a). To avoid costly litigation regarding title to valuable resource producing lands, Congress provided for compensation to "Native Alaskans" while simultaneously extinguishing claims based on aboriginal title. As part of the compensation package, the ACSA provided for creation of

---

**46.** *See generally* Frankfurter, *Some Reflections on the Reading of Statutes,* 47 Colum.L.Rev. 527 (1947). Before proceeding further, the Court notes that consideration of the purpose of section 8(g)(4) leads to the conclusion that a suit for a *"fair and equitable"* division of 8(g) lease revenue is an exclusive remedy. This result is consistent with the congressional purpose of alleviating litigation-related delay of OCS development.

**47.** 42 U.S.C. § 1331.

**48.** *Cf. United States v. Turkette,* 452 U.S. 576, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1980) (Had Congress intended to limit RICO to "legitimate" enterprises it easily could have done so. *Id.* at 581, 101 S.Ct. at 2527. Accordingly, it is not for the Supreme Court to create such a limitation).

an Alaska Native Fund into which Alaska would have to pay one-half billion dollars in mineral resource revenue which would have otherwise been payable to the State. 43 U.S.C. § 1608.

Of primary significance to the instant case, in drafting the ACSA, Congress expressly delineated when revenue received "as compensation for estimated *drainage of oil and gas* shall, for purposes of this section, be deemed to be revenues from disposition of oil and gas. . . . , 43 U.S.C. § 1608(f), and payable into the fund." Defendants have failed to offer, nor can there be, any plausible explanation for Congress' explicit textual limitation in the ACSA and the omission of a similar textual limitation to drainage in the OCSLA; save one—that Congress distinctly chose not to limit the OCSLA standard for a *"fair and equitable"* disposition of revenue to compensation for drainage.

Similarly, in the Outer Continental Shelf Lands Act as originally enacted in 1953, Congress included textual references to problems imposed by the potential occurrence of drainage. Section 1334(a) which prescribes the scope of the Secretary's rule making authority, for administering the OCSLA, contains a specific textual reference to drainage as pertaining to the rights of individual federal lessees. Section 1334(a) provides "[t]he Secretary may at any time prescribe and amend such rules and regulations as he determines to be necessary and proper in order to provide for the prevention of waste and conservation of the natural resources of the outer Continental Shelf, and the *protection of correlative rights* therein, . . ." 43 U.S.C. § 1334(a) (emphasis added). In other words, Section 1334(a) empowered the Secretary to promulgate regulations to protect one federal lessee from drainage by another federal lessee, *i.e.,* protection of correlative rights.[49] In contrast, section 8(g) contains no reference to "correlative rights," no indication that Congress included Sec-

tion 8(g) solely as a means to compensate States for oil and gas drained from beneath their lands by Federal lessees.

Defendants, however, urge this Court to adopt a pedantically narrow reading of Section 8(g). They advance a variform rationale to support their conclusion that the "plain meaning" of the statute confines the Court's inquiry to considerations of compensation for drainage. Taken individually or viewed together, these arguments are inadequate. Defendants' first two arguments relate to the underlying geology of oil and gas development. First, defendants direct the Court's attention to structural aspects of Section 8(g), they note that it applies only to federal tracts containing geological structures common to both Federal and State lands. They conclude that "[t]he link between tracts with common pools or fields and compensation for drainage is self-evident." Memorandum in Support of Defendants' Motion for Partial Summary Judgment at 6. Defendants' second argument, a corollary to the first, is couched in similar language of things which are self-revealing. Specifically, they contend "[t]he fact that Congress singled out Federal leases located closest to States' submerged lands as the source of compensation is itself a statement that the potential for drainage is the reason for the section, [*i.e.,* Section 8(g) ]." *Id.* at 7. By way of analysis, defendants reason that potential drainage through wells located on immediately adjacent tracts is "distinct" *i.e.,* real; while the potential for drainage from wells located on federal tracts more than three miles from state lands "is virtually nonexistent." *Id.* Initially, the Court notes defendants' complete failure to offer any support for their assertions regarding the geological potential for drainage. In other words, defendants have adduced no convincing evidence that the potential for migration of oil and gas within three miles of State submerged lands is "distinct," but migration beyond three miles is "virtually nonexistent." Defendants have failed to

---

**49.** *See* 8 H. Williams & C. Meyers, Oil and Gas Law, Manual of Terms 151 (1982) (Defining     correlative rights).

identify any geological barrier running parallel to but three miles from State lands.

For another reason, however, both this argument, and defendants' first argument, miss the mark. Neither party disputes that drainage is *one* criteria relevant to a determination of what constitutes a *"fair and equitable"* disposition of lease revenue pursuant to Section 8(g). Significantly, the very geologic circumstance which may lead to drainage may also result in value enhancement of adjacent tracts. The very geologic structure which may be subject to drainage will also give rise to the information externalities which enhance the value of adjacent tracts.[50] Thus, whenever the link between a common pool or field and compensation for drainage is self-evident, the link between the same common pool or field and compensation for bonus enhancement will be equally self-evident. Therefore, it is far from self-evident that drainage is the *sole, exclusive* measure for determining what is fair and equitable.

Nonetheless, these two arguments illustrate the difficulty attendant to statutory interpretation when alternative constructions involve differentiations of degree rather than distinctions in kind.[51] In this case, both the plaintiff's bonus enhancement theory and the defendants' drainage theory are rooted in nearly identical geological circumstances, the very existence of common geological structures underlies the potential for drainage and concomitantly gives rise to the information externality which increases the value of tracts adjacent to previously explored or developed tracts. Accordingly, a statute intended to provide compensation for inequities arising out of juxtaposition of ownership interests could embrace both drainage and value enhancement. For this reason, defendants' contention urged in terms of "self-evident truth,"[52] that the statutory framework supports a "drainage only" reading of Section 8(g) is unpersuasive.

Defendants suggest that the Secretary's obligation to provide geological information to governors of coastal states, at the time he solicits nominations is intended "to put states in the best position possible for assessing the potential for drainage ... so that they may negotiate a fair and equitable division of revenues..." *Id.* at 6. Here again, defendants miss the mark. The information relevant for determining the potential for drainage from specified tracts is the identical information pertinent to determining the potential for enhancement of the value of the same tracts. Thus, this argument fails to support defendants' conclusion that drainage is the *sole* criterion relevant to disposition of revenue pursuant to Section 8(g).

Of primary analytical significance, careful examination of the time frame for leasing, established by the OCSLA, inexorably leads to the contrary conclusion; *i.e.,* that drainage is not an exclusive criterion. The statute directs the Secretary to provide voluminous geologic, ecological and geographical information to the States *prior to leasing* and, therefore, before either exploration or production commence. Yet, as the parties agree, actual drainage cannot be measured accurately *prior to production.*[53] Prior to leasing, exploration, development, and production, the information the Secretary must furnish to the States is largely irrelevant to negotiations concerning an agreement limited to compensating States for drainage. The information would be of little or no value to a State's governor at the time he or she negotiated with the Secretary regarding the central

---

**50.** *See* Trial Transcript for Nov. 30, 1982, at 144 (Testimony of defendants' economist Dr. Walter Mead).

**51.** *See* McCoy, *Logic vs. Value Judgment in Legal and Ethical Thought,* 23 Vand.L.Rev. 1277, 1284–85 (1970).

**52.** Defendants analytic approach to interpretation of the statutory text recalls Humpty Dump-

ty's famous exposition on language. " 'When I use a word' Humpty Dumpty said, in a rather scornful tone, 'it means just what I chose it to mean—neither more nor less' " Lewis Carroll, Through the Looking Glass 197 (1939).

**53.** Transcript of Hearing on Motions, Jan. 21, 192, at 17–18.

issue to such an agreement, *i.e.*, what *formula* [54] should be used to calculate the quantity of oil and gas, in place, under State lands, and therefore subject to drainage. Texas' tract 14L provides the quintessential illustration. In 1975, Texas leased tract 14L to Superior Oil Company and pursuant to the lease agreement, Texas was to receive an 80.6 percent royalty. Thereafter, Superior Oil Co. leased the adjacent federal tract, Sabine Pass Block 9. To ensure adequate compensation for drainage of oil or gas through wells located on Sabine Pass Block 9, Texas would be concerned with two things prior to production, and, *a fortiori*, prior to federal leasing of Sabine Pass Block 9. First, Texas would want to ensure that it received an 80.6 percent royalty for any Texas' oil or gas produced through federal wells. Second, Texas would be concerned with the formula used to determine the quantity of oil and gas in place and, hence, subject to drainage. To negotiate on these two points, however, the information provided by Section 8(g)(1) is unnecessary. Thus, defendants' contention that the information requirement is intended to facilitate negotiation of a production agreement between the states and federal governments by enabling states to accurately assess the value of state lands which lie adjacent to federal tracts, appears to be disingenuous.

Conversely, because the benefits of tract value enhancement are *realized at the time of leasing*,[55] the information which the Secretary must furnish to the States prior to leasing is critical to assessing the extent, if any, of value enhancement likely to occur for a particular tract. In turn, such information would be vital to a State governor *at the time* he or she negotiated an agreement with the Secretary. Thus, it is plaintiff's view of Section 8(g) which is consistent with the information requirements contained in Section 8(g)(1).

Defendants proffer another, less convincing, interpretation of the Section 8(g)(1) information requirement. First, defendants note that Congress originally included the information requirement in an earlier version of Section 8(g), considered during the 94th Congress,[56] which would have resolved Federal-State offshore leasing conflicts by instituting a Federal-State joint leasing scheme for areas containing common pools or fields, instead of the *"fair and equitable"* division mechanism ultimately enacted. (Defendants' Memorandum in Response to Plaintiff's Brief in Opposition to Defendants' Motion for Partial Summary Judgment). Defendants reason that States entering into such joint leasing agreements would need significantly more information than necessary under the *"fair and equitable"* system. Defendants further reason that is why Section 8(g)(1), as drafted for the joint leasing scheme, requires the Secretary to furnish comprehensive geological and ecological information to the States. Defendants conclude

> [t]he committees in the 95th Congress *apparently overlooked* this provision entirely or, more likely, saw *no strong need to delete* it because it is consistent with and largely duplicative of the Act's repeated directives to provide the information and coordinate with adjacent states. See, *e.g.*, 43 U.S.C. §§ 1340(c)(2), 1344(c) and (d), 1345, 1346(c), 1351, 1352(d) (Supp. III 1979).

*Id.* at 12–13 (emphasis added).

For two distinct yet interrelated reasons, the Court is compelled to reject defendants' conclusion that Congress "apparently overlooked" or "indifferently left in" Section

---

**54.** *Cf. Atlantic Refining Co. v. Railroad Commission,* 162 Tex. 274, 346 S.W.2d 801 (1961) (Court reviewed formula required to ensure protection of adjacent landholders rights, including discussion of importance of "surface acres" and "acre-feet" in formula for protecting correlative rights); *See also Halbouty v. Railroad Commission,* 163 Tex. 417, 357 S.W.2d 364 (1962).

**55.** *See* Trial Transcript, Nov. 30, 1982, at 140 (Testimony of Dr. Mead) (Bonus bids on "drainage" tracts are approximately two and one half times larger than bonus bids on wildcat tracts). *See also infra* Finding of Fact Nos. 4–6.

**56.** *See* S. 3221 Cong.Rec.S. 6924 (daily ed. Sept. 18, 1974).

8(g)(1). First, defendants methodology is contrary to recognized principles of statutory construction.[57] In essence, defendants would have this Court disregard Section 8(g)(1) when determining the parameters of Section 8(g)(4). At bottom, defendants have fashioned a request to read out of the statute an unfavorable provision. In fact, defendants offer nothing more than speculation rooted in statutory transformations which occurred during the legislative process as a basis for their request.

Several bases for digressing from statutory text exist, but none exist for ignoring statutory text when a plausible, alternative construction is available. The key distinction between instances in which courts have extended their inquiry beyond the text of a statute, on the one hand, and defendants' argument regarding Section 8(g)(1), on the other, is that courts look beyond the text to discern meaning, not to ignore it. Defendants, however, ask not that the Court digress to discover congressional intent, but ask, instead, that the Court ignore Section 8(g)(1) in the process of construing Section 8(g)(4). This Court declines to do so.

Nor need the Court, in construing Section 8(g)(1) and then evaluating its interaction with Section 8(g)(4), "seek intimations [from legislative history] sufficient to read statutory silence as affirmative or negative." *Rogers v. Frito Lay, Inc.*, 611 F.2d 1074, 1078 (5th Cir.1980) (citations omitted). Here, the Court is not dealing with statutory silence, but must interpret statutory text. Moreover, cases in which courts have looked to legislative history to aid in statutory construction are inapposite here because defendants do not assert that Section 8(g)(1) is ambiguous, rather, they assert that it is inadvertently included excess verbage.

Finally, the legislative history supplies a second reason for rejecting defendants' view of Section 8(g)(1). Defendants' ration-

ale for Section 8(g)(1)—that negotiation of a joint leasing agreement necessitates the Secretary supplying comprehensive information to the States—implicitly suggests that the scope of a joint leasing agreement would not be limited to compensation for drainage, otherwise the information requirements of Section 8(g)(1) would be irrelevant to a joint leasing scheme as well. It follows, therefore, that tract value enhancement would fall within the contours of negotiations between the State and Federal governments under a joint leasing system.

For this reason, the Court has examined the legislative history to identify the congressional motivations underlying the shift from a joint leasing system to the *"fair and equitable"* division scheme. As noted previously, State-Federal relations concerning OCS development historically have been acrimonious, and, more than once, states have acted to impede federal offshore leasing.[58] Not surprisingly, then, some members of Congress feared that states might withhold approval of the terms of a particular proposed lease in order to stall and inhibit federal offshore leasing.[59] Responding to this concern, Congress substituted the *"fair and equitable"* division mechanism for the joint leasing provision. Thus, ensuring that offshore leasing would proceed at an expeditious rate was the impetus for transforming the method for leasing tracts in the 8(g) zone. Significantly, Congress apparently had no intention of altering either the composition of the corpus of lease revenue subject to division between the State and Federal government or to limit the scope of such agreements to compensation for drainage.

In drafting the several provisions of Section 8(g), Congress incorporated nonparallel terms to describe the geological area germane to the "offer" [60] stage of the leas-

---

57. *See, e.g., Jareki v. G.D. Searle & Co.*, 367 U.S. 303, 307–08, 81 S.Ct. 1579, 1582, 6 L.Ed.2d 859 (1961).

58. *See supra* note 22 and accompanying text.

59. *See e.g.,* 122 Cong.Rec. 16644.

60. *See supra* note 32 and accompanying text.

ing process and the "post-lease" [61] stage of the process. Section 8(g)(2) provides that whenever at least one oil or gas *pool or field* underlies both State submerged lands and tracts within the 8(g) zone, the Secretary must offer to the Governor of the State an opportunity to enter into an agreement concerning disposition of revenues which may be generated by lease of the 8(g) tracts. In contradistinction, Section 8(g)(4) provides that whenever the Secretary and Governor are unable to consummate such an agreement, the Secretary must deposit in an "escrow account" *only* revenues attributable to oil and gas *pools* common to both State submerged lands and the pertinent 8(g) tract. In short, Section 8(g)(2) applies to common *pools or fields;* Section 8(g)(4) applies only to common *pools.*

Not surprisingly, the parties draw divergent conclusions from this semantic non-parallelism. Defendants conclude that exclusion of "fields" from Section 8(g)(4) supports their drainage theory. To support this conclusion, defendants assert that the terms "pool" and "reservoir" are synonyms. According to defendants, both terms refer to geological structures, possessing a unitary pressure system, which are permeably integrated and, therefore, permit migration of oil and gas, or both, from one part of the structure to another. Defendants further assert that the term "field" refers to geological structures containing one or more reservoirs. Moreover, unlike "common pools" which, by defendants definition, are inherently subject to drainage, "common fields" are not inherently subject to drainage. To illustrate, a "common field" which contains two reservoirs, one of which is located exclusively beneath State offshore lands and the other of which is located exclusively beneath Federal offshore lands, would not be subject to drainage because federal lessees could only produce from the reservoir located beneath federal lands and state lessees could only produce from the reservoir beneath state lands. Based on their definitions of terms,

defendants reason by negative implication that because *"pools"* are always subject to drainage and because Section 8(g)(4) is limited to common *"pools,"* Congress must have intended to limit *"fair and equitable"* to compensation for drainage.

Plaintiff has submitted an extensive brief attacking the premise of defendants' interpretation. (Plaintiff's Second Supplemental Trial Brief). Plaintiff argues that *"pool"* and "reservoir" are not synonymous that defendants definition is contrary to common useage in geological circles; and that *"pools"* are not inherently subject to drainage. Plaintiff concludes that because *"pools"* are not so limited, defendants' construction of Section 8(g)(4) is erroneous.

In omitting to define *"pool,"* as used in the OCSLA Congress left to the courts a task of unexpected difficulty. Used in a context of generality, the term possesses an appearance of precision which fades when exact application becomes necessary. Pertinent authorities are numerous but equivocal. Moreover, equally verisimilar definitions result from a mere shift in emphasis. As defendants have suggested, *"pools"* may be applicable only to geological formations characterized by a single pressure system. Or, as plaintiff has urged, the term may be applicable to both geological formations possessing a unitary pressure system, and those geological formations containing multiple oil or gas accumulations characterized by independent pressure systems.

As Justice Frankfurter eloquently observed, "[w]ords of art bring their art with them. They bear the meaning of their habitat whether it be a phrase of technical significance in the scientific or business world, or whether it be loaded with the recondite connotations of fuedalism." [62] In *Corning Glass Works v. Brennan,* 417 U.S. 188, 94 S.Ct. 2223, 41 L.Ed.2d 1 (1974), a case involving interpretation of the Equal Pay Act, the Supreme Court echoed Justice

**61.** *See supra* notes 36–39 and accompanying text.

**62.** Frankfurter, *supra* note 46, at 537.

Frankfurter, and stated that "where Congress has used technical words or terms of art, it [is] proper to explain them by reference to the art or science to which they are appropriate." Id. at 201, 94 S.Ct. at 2231. (citations omitted) Though this guide to construction may be conclusive for terms which have a settled meaning within the community of their origin, it is of minimal utility when a term of art or technical word, like *"pool,"* is itself the subject of varied, conflicting definitions within the discipline of its common useage.

Courts and legislatures alike have applied numerous labels to describe the geological phenomenon, described above, which is characterized by accumulations of oil and gas in a pocket, physically separated from other accumulations of oil and gas by nonporous geologic barriers, which possess a single pressure system. These labels include *"reservoir," "common source of supply," "zone,"* and *"pool"* [63] of course, the use of several labels to describe a single geological phenomenon does not, in itself, give rise to interpretive difficulties. But, when a single label, like "pool," is applied to more than one distinct concept ambiguity and confusion may result.[64]

In numerous conservation statutes, states have defined the term "pool." [65] In the vast majority, the definition consists of two components. The New York statute provides an illustration.

"Pool" means [1.] an underground reservoir containing a common accumulation of oil or gas or both; [and 2.] each *zone*

of a structure which is completely separated from any other zone in the same structure is a pool. N.Y.[ENVTL. CONSERV.] Law § 23–0101(6) (McKinney 1973)

The first component equates *"pool"* and *"reservoir."* The second component equates *"pool"* and *"zone"* suggesting that "pool" is more encompassing than reservoir. In their multivolume treatise on oil and gas law, Professors Williams and Meyers cite the following definition of *"zone"*: " 'a stratigraphic interval containing one or more reservoirs.' " [66]. Thus, *"pool"* may be construed to include a stratigraphic interval containing one or more reservoirs and, therefore, not inherently subject to drainage. And, thus, the semantic nonparallelism fails to support defendants' negative implication regarding congressional purpose.

The decision in *Cities Services Oil Company v. Anglin,* 204 Okl. 171, 228 P.2d 191 (1951), provides another illustration of the ambiguity which is an attribute of oil and gas terminology as used to label a geological reservoir. In *Cities Services,* the court construed the Oklahoma conservation statute [67], and stated

"[w]e do not understand that in order to be a common source of supply as defined in ... § 86.1 the gas producing sand through the entire area must be free from all faults or obstructions of any kind, so that a well drilled on one portion thereof would ultimately drain the entire source of supply."

---

**63.** The parties agree that the term "reservoir" applies to an underground accumulation of oil or gas or both characterized by a single pressure system and is segregated from other such accumulations. Accordingly, the Court adopts this definition of reservoir for use throughout this opinion.

**64.** *See* McCoy, *supra* note 51, at 1285.

**65.** *See* Plaintiff's Ex. 34.

**66.** 8 H. Williams & C. Meyers, *supra* note 49, at 842.

**67.** The Oklahoma conservation statute provides in pertinent part, as follows:

The term "common source of supply" shall comprise and include that area which is underlaid or which, from geological or other scientific data, or from drilling operations, or other evidence, appears to be underlaid, by a common accumulation of oil or gas or both; provided, that, if any such area is underlaid, or appears from geological or other scientific data, or from drilling operations, or other evidence to be underlaid by more than one common accumulation of oil or gas or both, separated from each other by a strata of earth and not connected with each other, then such area, as to each said common accumulation of oil or gas or both, shall be deemed a separate common source of supply. Okla.Stat.Ann. tit. 52, § 86.1(c) (West).

Implicitly, then, defendants' characterization of the terms applied to define an accumulation of oil and gas possessing a single pressure system conflicts with the view espoused by the court in *Cities Services.*[68]

Of paramount analytic significance, defendants' construction also conflicts with the geological circumstances existing in the Gulf of Mexico. At trial, the evidence established that geological conditions beneath the Gulf of Mexico do not conform to the niceties of textbook definition. This is best illustrated by defendants own drainage evaluation[69] which seemingly establishes that, in some instances, state wells have produced more oil or gas than geological estimates indicate a particular reservoir contained. For example, defendants contend that wells drilled on Texas' High Island Block 14L drained gas from beneath Federal Sabine Pass Block 9. Moreover, the evidence produced at trial suggests that more gas has been produced through state wells than estimates of reserves indicate was contained in the pertinent reservoir. This, of course, is a geophysical impossibility, *i.e.*, a well cannot produce more than the reservoir contains.

It is apparent that the subsurface geological conditions in the Gulf of Mexico do not fall neatly into classroom categorizations formulated in an antiseptic academic environment. The evidence establishes that the geological structures beneath the Gulf of Mexico possess sufficient homogeneity to give rise to valuable information externalities which affect the value of adjacent tracts, but are not homogeneous enough to admit to precise academic pigeonholing. Accordingly, because these structures defy exact geological classification, application of defendants' restricted definition of pool will thwart the announced congressional purpose of protecting states interests by ensuring a *"fair and equitable"* disposition of 8(g) lease revenue.

■ Even under defendants limited, drainage-only theory, defendants' definition of *"pool"* is unworkable. Because of the inexactitude attendant to determinations of drainage when one or more particular reservoirs do not admit to geological categorization, courts confronted with a statutory mandate to fairly and equitably divide revenue could not, with any reasonable degree of certainty, ensure that a state received compensation for oil or gas drained from beneath its lands. To effectuate congressional goals,[70] a nonpedantic definition of *"pool"* is required. Thus, the Court concludes that the term *"pool"* as it appears in Section 8(g)(4) should not be read to mean common reservoir, but should be construed as referring to hydrocarbon-prone areas which may or may not be subject to cross migration.

Though the legislative history is ambiguous, and in no instance did Congress direct its attention to the problem presented here, *i.e.* as to the breadth of the term *"pool,"* the report of the Senate Committee on En-

---

**68.** Defendants view is also at odds with actual oil and gas bidding practices. Defendant suggests that "[p]ools only produce revenues when drilled and found to contain hydrocarbons...." Defendants' Proposed Conclusions of Law and Findings of Fact at 2. The evidence in this case, however, suggests otherwise. Risk and value share an inverse relationship. That is, as risk increases value decreases. *See generally* Gilley, Karels & Lyon, *The Economics of Alternative Leasing Systems on the Outer Continental Shelf,* 18 Hous.L.Rev. 1061 (1981). Moreover, Risk and information share an inverse relationship. Thus, as information increases risk decreases. *Id.* Because the information parameters of a particular geological structure are revealed, in total, only after drilling, a tract containing a geological structure may appear to contain a "pool" and therefore receive bids, when in fact

there is no "pool" in the geological structure. This eventuality is contemplated by the definition of "pool" contained in professors Williams and Meyers multivolume treatise and cited by Defendants. Professors Williams and Meyers definition includes "underground reservoir[s] containing or *appearing to contain* a common accumulation of oil and natural gas." 8 H. Williams & C. Meyers, *supra* note 49 at 554. Indeed, though much of the instant litigation has focused on the nature of oil and gas bidding, Defendants apparently have ignored or rejected practical considerations in reading the statute.

**69.** *See* Defendants Ex. 505.

**70.** *See supra* note 26.

ergy and Natural Resources[71] analyzing S.9,[72] an OCS bill which used the terms *"pool"* and *"field"* in a manner parroted by the OCS amendment eventually enacted, supports a broader reading of the term *"pool."* Describing the scope of what ultimately became Section 8(g) the Senate report stated: "[f]inally, this section provides for a system whereby the revenues from Federal leasing of a *field, structure* or *trap* which is within both the OCS and State jurisdiction, shall be equitably divided between the State and Federal Government."[73] Here, the Senate Committee contemplated division of the revenue from 8(g) leases containing a *field, structure,* or *trap, i.e.,* a hydrocarbon-prone area. That the Senate Committee was referring to text

identical to that contained in the OSCLA, as adopted, is telling. Clearly, then, defendants circumscribed construction of the term *"pool"* does not comport with Congress' reading of the statute.

The statutory language delineating the revenues which must be placed in a separate treasury escrow account, pending a court determination of what constitutes a *"fair and equitable"* disposition, provides yet another telling cue that defendants narrow statutory interpretation misreads congressional intent. Section 8(g)(4) requires the Secretary to deposit in a separate treasury account "all bonuses, royalties, and *other revenues* attributable to oil and gas pools...." (emphasis added). Earlier versions of Section 8(g) contained an itemized

---

71. S.Rep. No. 95–284, 95th Cong., 1st Sess. (1977).

72. *See* Murphy & Belsky, *supra* note 17, at 325 n. 48.

73. S.Rep. No. 95–284, *supra* note 74, at 74 (emphasis added). The statutory language which the report applied to provides in pertinent part:

(f)(1) At the time of soliciting nominations for the leasing of lands within three miles of the seaward boundary of any coastal State, the secretary shall provide the Governor of any such State—
(A) an identification and schedule of the areas and regions offered for leasing:
(B) all information concerning the geographical, geological, and ecological characteristics of such regions;
(C) an estimate of the oil and gas reserves in the areas proposed for leasing; and
(D) an identification of any field, geological structure, or trap located with three miles of the seaward boundary of a coastal State.
(2) After receipt of nominations for any area of the outer Continental Shelf within three miles of the seaward boundary of any coastal State, the Secretary shall inform the Governor of such coastal State of any such area which the Secretary believes should be given further consideration for leasing. The Secretary in consultation with the Governor of the coastal State, shall determine whether any such area may contain one or more oil or gas *pools or fields* underlying both the outer Continental Shelf and lands subject to State jurisdiction. If the Secretary selects a tract or tracts which may contain one or more oil or gas *pools or fields* underlying both the outer Continental Shelf and lands subject to State jurisdiction to Secretary shall offer the Governor of such coastal State the opportunity to

enter into an agreement concerning the disposition of revenues which may be generated by a Federal lease within such area in order to permit their fair and equitable division between the State and Federal Government.
(3) Within ninety days after the offer by the Secretary pursuant to paragraph (2) of this subsection, the Governor shall elect whether to enter into such agreement and shall notify the Secretary of his decision. If the Governor declines the offer, or if the parties cannot agree to terms concerning the disposition of the offer, or if the parties cannot agree to terms concerning the disposition of revenues from such lease (by the time the Secretary determines to offer the area for lease), the Secretary may nevertheless proceed with the leasing of the area.
(4) Regardless of any other provision of this Act the Secretary shall impound, in whole or in part, in a separate account in the Federal treasury all bonuses, royalties, and other revenues attributable to oil and gas *pools* underlying both the outer Continental Shelf and submerged lands subject to State jurisdiction until such time as the Secretary and the Governor of such coastal State agree on, or if the Secretary and the Governor of such coastal State cannot agree the United States district court determines the fair and equitable disposition of such revenues and any interest which has accrued and on the properate of payments to be deposited in the treasuries of the Federal government and such coastal State.
*Id.* at 12–13; *Cf.* Outer Continental Shelf Lands Act Amendments of 1977: Hearings on H.R. 1614 before the Ad Hoc Select Committee on the Outer Continental Shelf, 95th Cong., 1st Sess. 1529 (structure is "any portion of layered rock sequence that is potentially capable of trapping liquid or gases and hydrocarbons.")

list of revenue to be deposited in an "escrow" account if the Secretary and coastal State's Governor failed to consummate an agreement.[74] More specifically, these "other revenues" included all bonuses, royalties, *rents* and net profit shares.[75] Defendants agree that the term "other revenues" included in Section 8(g), as enacted, encompass the various forms of revenue listed in earlier versions of the OCSLA.[76] Because some of these revenues are unrelated to production, *i.e.*, the lessee must pay them regardless of whether exploration and development are successful, their inclusion as revenue to be separately deposited in "escrow," and thus their being subject to division, undercuts defendant's drainage only theory.

Delay rentals provide a clear illustration. Professors Williams and Meyers define a delay rental as "[a] sum of money payable to the lessor by the lessee for the privilege of deferring the *commencement of drilling* operations or the commencement of production during the primary term of the lease." [77] Because such payments may be required prior to drilling, it is apparent that they reimburse the lessor for the time value of any money which may be received if drilling proves successful. Such payments are not linked to the volume of production, and therefore, are unrelated to actual or potential drainage. It requires credulity to suppose that Congress required deposit of revenues which have no conceivable relationship to drainage and simultaneously

limited the basis for division of these very revenues to compensation for drainage.[78]

Among the more notable reasons for rejecting defendants restrictive interpretation of Section 8(g) is that it would tend to frustrate activity directed toward achievement of the congressional goals underlying enactment of the OCSLA. Congress intended to promote accelerated OCS development to reduce American dependence on imported petroleum.[79] The evidence introduced in the instant case, however, establishes that the natural operation of a free market economy provides prodigious disincentives to the initial or first lessor for tracts located along the State-Federal offshore border. Application of defendants interpretation of the statute permits the second, or later, lessor to reap the benefits arising from the information externalities generated by the exploration attendant to the earlier leasing. The evidence produced by plaintiff, through P.G. Von Tungeln, illustrates best the enhancing effect created by information externalities. Mr. Von Tungeln explained

It is a matter of common principle that an explorationist evaluates three factors when considering the likelihood of any particular prospect containing hydrocarbons in economically producible quantities. First, the explorationist must determine whether a geologic structure is present to serve as a vessel for hydrocarbon accumulation. Second, the explora-

---

**74.** 122 Cong.Rec. 23190–23191 (July 21 1976) (House version, 94th Congress).

**75.** *See* H.R.Rep. No. 94–1084, 94th Cong., 2d Sess. 12–13 (1976) (emphasis added).

**76.** Defendants' Post Trial Argument, at 7.

**77.** H. Williams & C. Meyers, *supra* note 49, at 175.

**78.** Plaintiffs insist that "other revenues" include both corporate income taxes and windfall profits taxes. *See* Plaintiff's Proposed Findings of Fact Nos. 108–28. In view of the paucity of evidence produced to support this contention, the Court need not decide whether such tax revenues fall within the ambit of the statute. Considering the testimony at trial, it is conceiva-

ble that the Windfall Profits Tax would be, in some instances, an appropriate factor to weigh when considering what constitutes a fair and equitable disposition. Defendants own expert witness, Dr. Mead, agreed that excise taxes, like the Windfall Profits Tax, which are tied to production, are akin to royalty payments, notwithstanding differences in nomenclature. *See* Trial Transcript, Nov. 30, 1982, at 213 (Testimony of Dr. Mead). Accordingly, upon a showing that the federal government intentionally acted to receive its lease revenue in the form of a Windfall Profit Tax rather than as bonus or royalty such a tax might appropriately be incorporated into the "fair and equitable" calculus. Such is not the case here.

**79.** *See supra* notes 17–21 and accompanying text; *see also supra* text accompanying note 26; H.R.Rep., *supra* note 16 at 53–55, 104–06, & 140.

tionist must determine whether there is a reservoir rock present within the structure which is capable of storing hydrocarbons. Third, the explorationist must evaluate the ability of that reservoir rock to accumulate hydrocarbons and allow their migration into a producing well. Although it is possible to utilize seismic or other geophysical data to locate structures, and perhaps reservoirs, the only method to evaluate the reservoir rock's ability to produce oil is to penetrate the rock with a drill bit. Although it would be ideal to have information regarding reservoirs in particular, it is invaluable to have information regarding the characteristics of the reservoir rock strata in general. The explorationist *nearly always relies very heavily on the nearest well control to provide a significant amount of information concerning all three of the three key elements*, particularly information concerning reservoir rock strata.

(affidavit of Mr. P.G. Von Tungeln February 4, 1982). Mr. Von Tungeln observed that "[m]uch of the nearest well control along the three-league line [*i.e.*, along the State-Federal border,] has been on the state side of the line due to its more aggressive leasing policy." *Id.* Mr. Von Tungeln concluded "the State's aggressive policy of leasing has apparently enhanced the bonuses received by the Federal Government on tracts immediately seaward of the three-league line." *Id.* The Court is convinced that Mr. Von Tungeln's conclusion is well founded and correct. As the Court noted at trial, explorationists often rely on "closeology" more than they rely on "geology." [80]

Defendants interpretation, however, will encourage the prudent, rational lessor to forego early leasing in order to enjoy the substantial economic benefits afforded the second lessor. Thus, defendants construction would emasculate the statute which

---

80. Defendants expert, Doctor Mead, testified that the first lessor reaped a windfall. In strictly theoretical terms this may be true, but in terms of actual monetary income it is the second lessor who benefits. Trial Transcript, Nov. 30, 1982, at 144 (Testimony of Dr. Mead). The divergence between theoretical and actual benefit is attributable to the economists yardstick for measuring benefit. Dr. Mead compared the bonus received to the value of the land in light of the quantity of oil and gas actually discovered and produced. Thus, early lessees, though bidding less, in actual dollars, paid higher bonuses in relative terms, *i.e.*, dollars per acre per/barrel produced, because they were successful less often. By comparison, subsequent lessees armed with greater knowledge paid lower bonuses in relative terms, *i.e.*, dollars per acre/per barrel produced, because they were successful more often. But notwithstanding the theoretical gesticulations of economists, the bottom line remains unchanged, significant monetary benefits, *in dollars actually received,* flow to the second lessee. Though it may be that abstract hindsight reconstruction is the province of economists, coloring theoretical explanation with a hue of practicality is the bailiwick of jurists. And thus, this Court must look beyond esoteric machinations to find the pragmatic implications of alternative approaches. Here, this role requires recognition of real-world factors in the calculus invoked to explain the differential between the level of bonuses received by Texas and that of bonuses received by its Federal neighbors.

Defendants offered an alternative argument relevant to the enhancement issue. Defendants suggested that if *"fair and equitable"* includes considerations of enhancement, it necessarily must include considerations of value "disenhancement" as well. Defendants reason that if a producing well located on a State offshore tract enhances the value of an adjacent federal tract then a dry hole on a state offshore tract would detract from the value of an adjacent federal tract. Initially, the Court notes that defendants' disenhancement argument is subject to serious doubt as a matter of law. Arguably, Section 8(g) creates a one-way street. That is, only considerations of enhancement are relevant. Such an argument would be based on the absence of protection for the federal government from drainage by state lessees. *Cf.* 122 Cong.Rec. 23150 (Forsythe Amendment to OCS-LA which would have provided such protection rejected by Congress). But even assuming disenhancement is a proper consideration in the calculus employed to determine what is *"fair and equitable,"* defendants have failed to establish, as a factual matter, that disenhancement occurred in this case. The Court notes that the evidence produced indicates that the geological information generated by a "dry hole" may enhance the value of an adjacent tract. In view of this geological fact, it will be difficult indeed for defendants to prove disenhancement in future lease sales.

Congress designed to alleviate American dependence on imports of foreign petroleum through increased production of offshore oil and gas. If both the State and Federal Governments act like rational, prudent lessors, the chilling effect on leasing will be exacerbated, because each will await development by the other before leasing its own offshore lands.

In addition to being supported by the plain meaning of the statutory language, a more expansive reading of the statute achieves the opposite result, *i.e.*, removal of the economic disincentive attendant to pursuing a policy of vigorous and early offshore leasing. Thus, it is clear that to obtain results which are consistent with the congressional mandate embodied in the statute, a flexible standard must be applied. Indeed, only a standard which permits courts to abate the inequities attributable to information externalities will promote expeditious offshore exploration and development while ensuring a *fair and equitable* division of lease revenues—thereby fulfilling congressional objectives.

Nor does the choice of sweeping terms to identify the parameters of the statutory standard, for division of revenues, diminish the authority of the Congressional command. As the Supreme Court has noted, courts perform their constitutional duty by "construing the language Congress has employed. In so doing, ... [courts must] take statutes as ... they find them, guided, if ambiguity appears, by the legislative history and statutory purpose." *Diamond v. Chakrabarty*, 447 U.S. 303, 315, 100 S.Ct. 2204, 2211, 65 L.Ed.2d 144 (1980). As has been amply demonstrated above, the language employed by Congress, though broad, is plain.

The Court is unpersuaded by defendants' assertion that Section 8(g)(4) is ambiguous. In essence, defendants argue that the term *"fair and equitable"* is so broad that it is ambiguous. This contention is twice flawed. First, as the *Chakrabarty* Court observed "[b]road general language is not necessarily ambiguous when congressional objectives require broad terms." [81] *Id.* Here, the statutory goal of promoting "expedited exploration and development of the Outer Continental Shelf to achieve national economic and energy policy goals, ..." [82] is no more circumscribed than the statutory goal involved in *Chakrabarty*. [83]

Second, in their myopic treatment of the term *"fair and equitable,"* defendants' fail to attribute any weight to the guidance provided by the congressionally defined statutory purposes. [84] *Yakus v. United States*, 321 U.S. 414, 64 S.Ct. 660, 88 L.Ed. 834 (1944), is instructive. In 1942, Congress enacted the Emergency Price Control Act (EPCA), 56 Stat. 23, 50 U.S.C.App. Supp. II §§ 901 *et seq.*, as a temporary wartime measure. The Act established the office of Price Administrator, and authorized its director, the Price Administration, to "promulgate regulations fixing prices of commodities which in his judgment will be generally *fair and equitable* and will effectuate the *purposes of this Act.*" *Id.* at 418, 64 S.Ct. at 664; Petitioner's challenged the constitutionality of the EPCA asserting that it embodied an impermissible delegation of legislative power by Congress to the Price Administrator.

The Supreme Court, however, held otherwise. The Supreme Court found the standards contained in the EPCA were sufficiently precise and definite. Accordingly, the Supreme Court upheld the congression-

---

**81.** Secretary Andrus observed "[t]he guidance provided by this legislation to carry out an effective program *which can respond to changing needs* should be specific without excessive detail or inflexibility." H.R.Rep. *supra* note 16, at 216, U.S.Code Cong. & Admin.News 1978, p. 1622 (letter of March 21, 1977 from Secretary Andrus to Representative Murphy, Chairman House Ad Hoc Select Committee on Outer Continental Shelf) (emphasis added).

**82.** 43 U.S.C. § 1802(1).

**83.** The statutory purpose implicated in *Chakrabarty* was the promotion of "the Progress of Science and the useful Arts..." 447 U.S. at 315, 100 S.Ct. at 2211.

**84.** 43 U.S.C. § 1802.

al delegation of a "price-fixing" power to the Price Administrator. *Id.* at 426, 64 S.Ct. at 668. The Supreme Court noted that "[t]he boundaries of the field of the Administrator's permissible action are marked by the statute." *Id.* at 423, 64 S.Ct. at 666.

As previously noted, the EPCA authorized promulgation of regulations which " 'will be fair and equitable and will effectuate the purposes of this Act.' " *Id.* at 420, 64 S.Ct. at 665. The Supreme Court underscored the importance of the declaration of purposes as a limit on the Price Administrator's discretion. The Supreme Court's reliance on the declared congressional purposes as a guide to identifying the parameters of the statute is instructive. In the same way the Supreme Court relied on the congressional declaration of purposes to find the borders of the EPCA, this court has looked to the Congressional declaration of purposes accompanying the OCSLA.[85] Doing so, the Court has found

that the congressionally mandated purposes can only be realized by construing the term *"fair and equitable"* to require the Court to examine and weigh the totality of the circumstances.[86]

Moreover, it is significant to note, the Supreme Court did not depart from the text of the EPCA to determine the breadth of the congressional delegation of authority. Both the standards contained in the EPCA and those included in the OCSLA are of roughly equal specificity. Accordingly, there is no apparent reason to depart from the text of the OCSLA. In sum, when construed in light of the stated congressional purposes, Section 8(g) speaks clearly to the issues raised in this litigation.

Nevertheless, defendants vociferously urge this Court to embark upon a sojourn through the quagmire which is the legislative history of the OCSLA. The Court, however, is of the opinion that to descend from the statutory text into the murky depths of the legislative history would be

**85.** It is of little moment that the Emergency Price Control Act expressly directed the Price Administrator to adhere to the stated congressional policies, but the OCSLA does not. After all, when interpreting statutes, courts are primarily concerned with arriving at a construction that effectuates congressional purposes. Thus, inclusion of a specific directive to a court, to adhere to stated congressional purposes, would add little, if anything. Similarly, though the Emergency Price Control Act required the Price Administrator to supply a "statement of considerations" involved in formulation of the Price Administration's regulations, 321 U.S. 421–22, 64 S.Ct. 665–66, while Section 8(g) imposes no such requirement on district courts, no practical difference will accrue. By complying with the requirements of Rule 52, *Fed.R.Civ.P.,* a district court will effectively provide a "statement of considerations" akin to that required by the Emergency Price Control Act.

**86.** Of course, a totality of the circumstances standard is not without limits. For example, on shore impacts of offshore development are irrelevant to a determination of what constitutes a *"fair and equitable"* disposition of federal OCS 8(g) lease revenue. Congress addressed such problems in the Coastal Zone Management Act, 16 U.S.C. § 1451 *et seq.,* and the Coastal Energy Impact Program, 16 U.S.C. § 1456a. A second illustration is provided by plaintiff's claim that the Federal government reaped economic benefits because federal lessees could develop feder-

al tracts more quickly by taking advantage of existing pipelines to shore and other infrastructure in place, as a result of the State's earlier leasing. The core of this argument is that the state should share the incremental increase in revenue that the federal government received because federal lessees were able to develop their tracts more quickly because of pre-existing state activity. The Court is of the opinion that reimbursement for any such benefits conferred is best left to natural market forces. Indeed, in the instant case plaintiff received remuneration for permitting federal lessees to use offshore drilling platforms located on State offshore lands.

Notably, leaving this reimbursement to market forces will not impede expedited production, but will effect only the lessees' return. Conversely, excluding tract value enhancement from the *"fair and equitable"* calculus will act as a bar to production because the State and Federal governments acting as quasi-monopolist suppliers in the market for offshore tracts can structure their conduct, *i.e.* one can delay until after the other has leased, to reap the benefits accrued by the second lessor.

A third limitation on a totality of the circumstances review is found in the statutory text. Only lease revenue attributable to tracts located in the 8(g) zone are subject to division. *See supra* note 41. Of course, this list of limitations is meant to be illustrative, not exhaustive. *See supra* text accompanying note 46.

but a useless endeavor. Yet, "there is no errorless test for identifying or recognizing 'plain' or 'unambiguous' language," *United States v. Turkette,* 452 U.S. 576, 580, 101 S.Ct. 2524, 2527, 69 L.Ed.2d 246 (1981). Moreover, no bright line appears to distinguish those instances when a Court need not review legislative history from those times when it must.[87] Accordingly, the Court is compelled to examine, and now turns, to consider the OCSLA's legislative history.

Defendants contend that the legislative evolution of Section 8(g) establishes that compensation for drainage was the *exclusive* purpose underlying its enactment. The legislative record generated during consideration of the OCSLA is voluminous and includes hundreds of pages of committee reports [88] and thousands of pages of hearings,[89] yet only in a few instances does this record directly address the specific provision at issue in the instant litigation. On the narrow question of whether Section 8(g) was intended *solely* as a means of compensating States for oil and gas produced from beneath State lands by federal lessees, the legislative history is at best equivocal and, more accurately, can be characterized as silent.

The Court has examined with care the legislative history that has been marshalled by defendants. The Court finds no convincing support in the legislative history for the proposition that Congress intended to confine Section 8(g) in the manner defendants urge.[90] As previously mentioned, early versions of the OCSLA amendments contained a joint leasing system that required joint Federal-State leasing of tracts located within the 8(g) zone. As late as March 21, 1977, Secretary Andrus noted that the purpose of joint Federal-State leasing procedures was to achieve "common goals of oil and gas, which contribute to the *conservation* of the resource." [91] As suggested by Secretary Andrus' March 21 letter, the purposes of the joint leasing scheme extended beyond mere compensation for drainage.

Defendants note that a letter from Secretary Andrus to Representative Murphy [92] apparently was the catalyst which caused

---

**87.** Though the process of statutory interpretation is replete with canons, principles and rules of construction, these guides often do not admit to easy application. Among the more difficult interpretive dilemmas courts confront is the question of when to depart from the statutory text. A clear preference exists for applying the statute in accordance with its history rather than applying the history in lieu of the text. *See Pope v. Rollins Protective Services,* 703 F.2d 197, 206 (5th Cir.1983). Sound policy considerations favor application of the text and not the legislative history when the two arguably conflict. It is the statute not the history which the President signs into law. Likewise, it is the statute and not committee reports or hearings which are the subject of congressional consideration, debate and enactment. This is not to say that legislative history is not relevant. It is to say that legislative history must be reviewed and relied upon with caution. For example, legislative history may be manufactured or molded "for the purpose of misleading the courts as to what most members of congress intended to enact." *Heppner v. Alyeska Pipeline Service Co.,* 665 F.2d 868, 871 n. 1 (9th Cir.1981).

Even when legislative history is not intended to be misleading, courts must rely upon it with caution, especially when it is cited as a basis for limiting statutory text. The benchmark for proper statutory interpretation is determining whether a particular construction furthers congressional purposes and not deciding whether Congress envisioned the exact circumstances of the statutes' application. *Id.* In sum, when a literal reading of a statute is consistent with its congressional purposes, no need to depart from the text exists. *See Barbee v. United States,* 392 F.2d 532, 535 n. 4 (5th Cir.) *cert. denied,* 391 U.S. 935, 88 S.Ct. 1849, 20 L.Ed.2d 855 (1968).

**88.** *See, e.g.,* H.R.Rep. *supra* note 16.

**89.** See, *e.g., Outer Continental Shelf Lands Act Amendments of 1975: Hearings on H.R. 6218 Before the Ad Hoc Select Committee on the Outer Continental Shelf,* 94th Cong., 1st Sess. 1497 (1975).

**90.** In some instances, the pertinent history does not even mention drainage. See, *e.g.,* H.R.Rep. *supra* note 16, at 51 ("special leasing" of tracts in the 8(g) zone—no mention of drainage). In other instances drainage is raised, but in a non-exclusive manner. *See, e.g., Id.* at 144–45.

**91.** *See* H.R.Rep. *supra* note 16, at 216, U.S.Code Cong. & Admin.News 1978, p. 1622 (emphasis added).

**92.** *See Id.* at 220 (letter of May 10, 1977).

substitution of the eventually enacted *"fair and equitable"* disposition mechanism in place of the joint leasing scheme. Because Secretary Andrus referred to drainage in his letter, defendants conclude that drainage must be the exclusive purpose of Section 8(g). Defendants selective reading of one segment of the May 10th Andrus' letter effectively ignores the remainder of the Secretary's rationale for altering the pending Amendment to the OCSLA. Secretary Andrus observed

> special care must be taken not to undermine the Secretary's fundamental responsibilities under the statute and to be as clear as possible about the process under which the States would seek compensation. Thus, in the substitute subsection we are providing, the references to "joint leasing" have been removed and its *principal pupose,* compensation for the resource taken from State lands, more clearly brought into focus.[93]

In the first instance, it is noteworthy that the Secretary's desire to prevent coastal States from undermining his "fundamental responsibilities," and not a desire to limit the revenues subject to division, provided the impetus for the Secretary's proposed substitute. As previously noted, the Secretary's fear of coastal states undermining offshore leasing efforts is attributable to the perception that in a joint leasing system, by withholding cooperation, a coastal State might delay or prevent the leasing of tracts in the 8(g) zone.

A second aspect of the Secretary's letter casts doubt upon defendants' statutory construction. Secretary Andrus explicitly stated that compensation for resources taken from State lands is a *"principal* purpose" of Section 8(g). The Secretary did not suggest that it is a *exclusive* or *sole* purpose. Thus, a reasonable reading of the Secretary's letter contradicts defendants interpretation that *"fair and equitable"* is limited to compensation for drainage.

Examination of the legislative history reveals yet another reason to reject defendants' interpretation. In 1976 and again in 1978, members of Congress offered amendments to the OCSLA which would have expressly limited Section 8(g) to compensation for drainage.[94] Congress rejected both amendments. The reasons for congressional rejection of these amendments fails to enlighten regarding the question of whether Congress intended to limit Section 8(g) strictly to compensation for drainage. The proposed amendments themselves, however, illustrate that, on two occasions, Congress had before it alternative formulations of Section 8(g) which contained express drainage limitations. At a minimum, then, these proposed amendments establish conclusively the ease with which Congress could have, if it so desired, limited Section 8(g) to considerations of drainage.

The Court is aware that some legislative history supports the view that Section 8(g) is limited to compensation for drainage. Representative Murphy's comment on the

**93.** *Id.* (emphasis added).

**94.** In 1976, Representative Forsythe offered an amendment which provides in pertinent part, as follows:

(b)(1) Except as provided in subsection (a) of this section, in the case of any lease issued under this Act after the date of enactment of this subsection with respect to which production may, in the judgment of Secretary, *result in the drainage of oil or gas from lands of any State,* the Secretary shall.... (emphasis added).

122 Cong.Rec. 23150.

In 1978, Representative Fish offered a comprehensive substitute for the bill then under consideration. The Fish amendment provides in pertinent part:

(b) Section 8 of the Outer Continental Shelf Lands Act (43 U.S.C. 1337) is further amended by relettering subsections (c) through (j), and all references thereto, as subsections (h) through (o), respectively, and by inserting immediately after subsection (b) the following new subsections: ...

(e)(1) Prior to the sale of any lease under this Act after the date of enactment of this section with respect to which production may, in the judgment of the Secretary or in the judgment of the Governor of any affected State, result in the *drainage* of oil or gas from lands or such State, the Secretary shall.... (emphasis added).

124 Cong.Rec. 990.

floor of the House provides the clearest expression of this view. He said that when there "is a real possibility that ... [oil and gas beneath State lands] will be drained by a lessee operating on the Outer Continental shelf outside a State's jurisdiction, this could interfere with the State's rights. Section 202 intends to establish a protection for states by allowing joint Federal/State leasing...." [95] But as previously mentioned, in detail, application of such a narrow interpretation would undercut the congressional purposes which prompted enactment of the 1978 amendments. Lacking more convincing evidence, the Court is reluctant to adopt an interpretation that would frustrate congressional goals. At bottom, the Court believes that such a construction of the statute, which is at best merely arguable and surely not compelled by either its language or history, should be eschewed in favor of an interpretation which furthers the congressional purposes embodied in the 1978 amendments.

## FINDINGS OF FACT

1.) Four lease sales are germane to the division of revenue ordered by the Court this day, they are as follows: lease sale 58A held on July 7, 1979; lease sale 58A held on November 27, 1979; lease sale 62 held on November 11, 1980; and lease sale A66 held on July 21, 1981.

2.) Three other lease sales occurred during the pendency of this litigation, they are, as follows: lease sale 67 held on February 2, 1982; lease sale 69 held on November 17, 1982; and lease sale 74 held on August 24, 1983. Neither plaintiff's original complaint nor the pretrial order, in the original action, Civ. Action No. B–79–476–CA, covered these three lease sales. These sales however, are the subject of a separate action filed by plaintiff, Civ. Action No. B–83–743–CA, which was consolidated with the original action by order of this Court, on August 22, 1983. Lacking sufficient evidence, the Court makes no findings of fact pertaining to tracts included in these latter three lease sales.

95. 122 Cong.Rec. 23150.

3.) Based on defendants' Ex. No. 34, the Court finds that as of October 31, 1982, the separate treasury account should have contained $1,221,131,895 attributable to tracts contained in the lease sales at issue in this litigation.

4.) The Court finds the testimony of Dr. Joseph Stiglitz was persuasive. Dr. Stiglitz convinced the Court that information possess economic characteristics like those possessed by ordinary commodities, and that information externalities have a distinct, quantifiable economic impact. Based on the testimony of Dr. Stiglitz and based on the other evidence produced at trial, the Court finds that information generated by leasing and development on State tracts close to or abutting the three marine league border increased the value of federal tracts in the adjacent 8(g) zone. The Court was further persuaded by Dr. Stiglitz that by leasing its lands after the State the federal government captured an economic benefit created by the information externality generated by prior activity on the Texas side of the 8(g) border. This benefit manifests itself in the form of reduced risk for federal lessees and, therefore, higher bonus for the federal government lessor.

5.) The Court finds the testimony of Mr. P.G. Von Tungeln persuasive. The Court also finds both the "comparative sale method" and the "industry evaluation method," used by Mr. Von Tungeln to calculate lease bonus windfall or enhancement provide valid, reasonable, accurate and appropriate methods for determining the extent of lease bonus windfall or enhancement received by the federal government in excess of the lease revenues it would have received absent prior leasing and explorationist activity on the Texas side of the 8(g) border. Accordingly, the Court finds enhancement, as follows:

| Block | Enhancement in Millions of Dollars |
|---|---|
| Sabine Pass Blocks 5 & 6 | $ 32.107 |
| Sabine Pass Block 9 | 142.942 |

| Block | Enhancement in Millions of Dollars |
|---|---|
| High Island Block 17 | $ 29.557 |
| High Island Block 18 | 65.792 |
| High Island Block 19 | 105.359 |
| Galveston Blocks 103 & 104 | 4.038 |
| Brazos Block 437 | 3.514 |
| Brazos Blocks 438 & 439 | 7.476 |
| Matagorda Block 526 | 40.104 |
| TOTAL | $430.889 million |

Sabine Pass Blocks 5, 6, 9, 11, 17, 18, 19, and 40

High Island Blocks 35, 38, 39, 94, 105, 108, and 143

Galveston Blocks 103, 104, 213, 302, 303, and 304

Brazos Block 436, 437, 438, 439, 449, 450

Matagorda Blocks 526, 528, 557, 558, 565, 566, 657, 696, 697, and 717

Mustang Block 844

■ 6.) The Court has carefully weighed all the evidence produced by the parties and considered the totality of the circumstances, and finds that a *"fair and equitable"* division of the, above-listed, lease bonus windfall or enhancement is 50 percent for the State of Texas, including all accumulated interest attributable thereto, and 50 percent for the federal government, including all accumulated interest attributable thereto.

7.) The Court finds that several tracts are part within and part without the 8(g) zone. The Court has included this fact in its deliberations when weighing the totality of the circumstances regarding a *fair and equitable* division of the 8(g) lease revenue.

8.) The Court finds no overlap between the 8(g) zone adjacent to Texas' submerged lands and the 8(g) zone adjacent to Louisiana submerged lands. The Texas-federal 8(g) border is located three marine leagues (ten and one-half miles) from shore but the Louisiana-federal 8(g) border is located three miles from shore. Thus, because the Louisiana-federal 8(g) border and the Texas-federal 8(g) border are noncontiguous, no overlap exists.

9.) The Court finds that the royalty-rate disparity between the federal royalty of 16⅔% and the minimum Texas royalty of 25% is one factor relevant to the bonus differential between Texas lease bonuses and federal lease bonuses, and the Court has weighed it as such when considering the totality of the circumstances.

10.) The Court finds that the following tracts contain or potentially contain hydrocarbon-prone geological structures common to both the outer Continental Shelf and Texas' offshore submerged lands:

11.) The Court finds that the royalty-rate disparity between the average federal royalty of 16⅔% and the average Texas royalty of 25% gives rise to an additional economic incentive to develop and produce from wells located on federal OCS tracts because federal lessees receive a larger percentage of all oil and gas produced.

12.) The Court finds that the economic incentive, attributable to the royalty-rate disparity, to produce from wells located on federal OCS tracts is exacerbated when a single developer-lessee holds the lease for both the federal tract and the adjacent State tract.

13.) The Court finds that drainage of state resources may be the ultimate effect of the royalty-rate disparity.

14.) The Court finds that the record developed to date provides insufficient evidence to support a determination regarding a *fair and equitable* division of royalty revenue.

15.) The evidence produced suggests that for those tracts for which a potential for drainage of State resources exists, Texas' interests would be adequately protected by requiring the Secretary to deposit fifty percent of all royalty revenues into the separate treasury account.

16.) The Court finds as a matter of fact that the OCSLA imposes an onerous burden upon a district court; taxing to its maximum limit, the Court's ability to function as a fact finder. Cases like this one are exceptionally inscrutable, requiring an exhaustive and detailed examination of labyrinthian technical data. The confidence of the Congress in the sophistication of district courts and their ability to reach a *"fair and equitable"* solution provides lit-

tle solace while the Court is immersed, literally for months, in a swirling morass of petroleum engineering, geology, economics, history, and statistics, superimposed over principles of equity. Moreover, these difficulties are inherent to the nature of the subject, and would not be appreciably reduced if the Court only had to calculate a *"fair and equitable"* division of 8(g) revenue insofar as drainage is concerned. And though appointment of a Special Master, pursuant to Rule 53, Fed.R.Civ.P., might be thought to provide a solution to this problem, it is but an illusory remedy. It is simply unrealistic to expect a district court to find a single individual, willing to serve as a master, who is sufficiently well versed in economics, petroleum engineering, geology and statistics.

Political considerations aside, based upon the evidence produced in this case, it is irrefragable that an alternative method of dispute resolution in these 8(g) cases is necessary. To that end, compulsory unitization by which bonus, royalty and other revenue could be divided, pursuant to a statutorily identified formula, would provide a much better, more practical, solution.

## ORDER

In accordance with the foregoing memorandum opinion and findings of fact,

It is hereby ORDERED that:

1.) all claims related to and arising out of federal lease sales 67, 69, and 74 are severed from this action;

2.) all revenues including bonuses, royalties and other revenues, generated by federal lease sales 67, 69, and 74, attributable to hydrocarbon-prone geological structures are to remain in, or be deposited in, a separate treasury account;

3.) fifty percent of all lease bonus windfall or enhancement, as listed in Finding of Fact No. 5, and the interest attributable thereto, shall be paid to the federal government. The remaining fifty percent of all lease bonus enhancement or windfall, as listed in Finding of Fact No. 5, and the interest attributable thereto, shall be paid to the State of Texas;

4.) fifty percent of all existing royalty revenues, and the interest attributable thereto, and 50% of all future royalty revenues generated by production from those 8(g) tracts, listed in Finding of Fact No. 10, shall be paid to the federal government. The remaining fifty percent of all existing or future royalty revenues, and the interest attributable thereto, generated by production from those 8(g) tracts listed in Finding of Fact No. 10, shall be retained or deposited in the separate treasury account, pursuant to 43 U.S.C. § 1337(g)(4);

5.) all other federal 8(g) lease revenue for tracts contained in lease sales 58, 58A, 62 and A66 and not specifically distributed by Nos. 1–4 above shall be paid to the federal government; and

6.) in accordance with the foregoing, the parties may submit proposed judgments reflecting accumulated interest through March 1, 1984.