STATE OF LOUISIANA, ex rel.
William J. GUSTE, Jr.,
Attorney General,

v.

The UNITED STATES of America; the Secretary of the Interior; the Director of the Minerals Management Service; and Samedan Oil Corporation.

Civ. A. No. 86–0924 "L".

United States District Court,
W.D. Louisiana,
Lafayette-Opelousas Division.

Dec. 19, 1986.

William J. Guste, Jr., Atty. Gen., Gary L. Keyser and Mary Ellen Leeper, Asst. Attys. Gen., Baton Rouge, La., for plaintiff.

Lawrence Moon, Asst. U.S. Atty., Lafayette, La., for USA and Director of the Mineral Management Service.

Lawrence E. Donohoe, Robert K. Reeves, Randall C. Songy, Patrick G. Tracey, Jr. and R. Thomas Jordan, Jr., Onebane, Donohoe, Bernard, Torian, Diaz, McNamara & Abell, Lafayette, La., for Samedan Oil Corp.

Charles W. Findlay, Lisa Hemmer and Poe Legette, U.S. Dept. of Justice, Washington, D.C., for Land and Natural Resources Div.

George W. Hardy, III, Michael R. Mangham and Louis R. Davis, Broadhurst, Brook, Mangham & Hardy, Lafayette, La., for Cashco Oil Co.

L. Todd Gremillion, Dotson, Babcock & Scofield, Houston, Tex., and Andrew L. Gates, III, Dotson, Babcock & Scofield, Lafayette, La., for Seneca Resources Corp.

B.J. Duplantis, Gordon, Arata, McCollam, Stuart & Duplantis, Lafayette, La., for Pelto Oil Co.

## OPINION

DUHE, District Judge.

A celebrated observer of American government once wrote "[s]carcely any political question arises in the United States that is not resolved, sooner or later, into a judicial question." de Tocqueville, *Democracy In America* 280 (1956 ed.). The validity of that comment, penned more than one hundred and fifty years ago, is demonstrated by this case. This Court is called upon to resolve a suit brought by the State of Louisiana against the United States, the Secretary of the Interior, the Director of the Minerals Management Service (collectively "Federal Defendants"), and Samedan Oil Corporation ("Samedan"). The dispute concerns the depletion of an allegedly common hydrocarbon pool, underlying both state and federal submerged lands. Despite the attention of Congress and both Executives, this issue—involving the allocation of potentially billions of dollars of resource generated revenues—now rests before this court on a motion for summary judgment.

Finding no issue of material fact, I am prepared to rule on the outstanding substantive issues. For the reasons outlined below, I hold that monies paid to Louisiana under the 1986 amendments to § 8(g) of the Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C. § 1331 *et seq.*,[1] are intended to compensate the state for federal drainage of common hydrocarbon reservoirs. Accordingly, the Secretary of the Interior has no duty under § 8(g) to enter into a unitization or royalty sharing agreement to compensate states for drainage losses.[2] I find that Louisiana's acceptance of funds under § 8(g) forecloses any claim for drainage losses.

I further rule that an alleged 1975 policy agreement between the sovereigns provides no basis for this action. Additionally, I find no basis in the doctrine of correlative rights to enjoin Samedan's production of hydrocarbons.

This holding terminates the litigation in this Court. Accordingly, the outstanding nondispositive motions are moot, except for the motion of plaintiff, the State of Louisiana, and plaintiffs-intervenors, Cashco Oil Company ("Cashco"), Seneca Resources Corporation ("Seneca"), and Pelto Oil Company ("Pelto") to permit disclosure of protected materials to MGF Corporation ("MGF"). That motion is denied.

## FACTS

West Delta Block 18 is a rectangular tract of ocean approximately fifteen miles east southeast of Grand Isle, Louisiana. This area is divided by a line established by the United States Supreme Court in *United States v. State of Louisiana,* 422 U.S. 13, 95 S.Ct. 2022, 44 L.Ed.2d 652 (1975). The

1. These amendments are contained in the Consolidated Omnibus Budget Reconciliation Act of 1986, Pub.L. No. 99–272, §§ 8002–8004, 100 Stat. 147–51.

2. "Unitization" refers to the consolidation of separately owned lease interests for the joint exploration or development of a hydrocarbon reservoir under the terms of a unit agreement 30 C.F.R. 250.2(jjj) (1986).

line was drawn parallel to the Louisiana coastline, three miles offshore.[3] The Submerged Lands Act of 1953, ch. 65, 67 Stat. 29 (codified at 43 U.S.C. § 1301 *et seq.*), recognized in Louisiana the power to manage, lease, and develop the seabed inside the decree line. The Secretary of the Interior has authority to manage, lease, and develop areas seaward of the line. 43 U.S.C. § 1334(a).[4]

In July, 1983 Samedan acquired a federal lease in West Delta Block 18. This lease, designated OCS-G-5669, is adjacent to State Lease 10088, held by Cashco, Seneca, and Pelto. Samedan completed three wells on its lease and began producing hydrocarbons. The state's lessees also completed producing wells on their leasehold.

Louisiana and its lessees conducted studies which indicated that the penetrated hydrocarbon reservoirs underlay both state and federal lands. Consequently, the State believed that Samedan's wells, allegedly in a structurally advantageous position, were draining gas from beneath State acreage. The defendants contested this claim. The State calculated that 84% of the total recoverable reserves underlay State lands, and that Samedan's position and production rates would permit the recovery of a disproportionate share of the allegedly common pool. Additionally, the State contended that Samedan's "excessive production rate" would ultimately decrease the total amount of hydrocarbons recovered.

In April, 1986 the State became aware of Samedan's intent to install compression equipment on its wells to increase production, which would aggravate the migration of hydrocarbons. Accordingly, the State filed this suit seeking declaratory and injunctive relief.

The State and its lessees ask for an injunction to: (1) limit defendant Samedan's rate of production "consistent with that proportion of recoverable [gas] reserves underlying the federal portion of the affected reservoirs," and (2) directing the Secretary of the Department of the Interior to negotiate with the state to achieve unitization of the affected reservoirs.

Plaintiffs also seek a declaratory judgment that the defendants have violated the following: (1) the OCSLA, in particular, 43 U.S.C. § 1337(g) ("§ 8(g)"), as amended by the Comprehensive Omnibus Budget Reconciliation Act of 1986; (2) "an agreed and established policy arising from an informal agreement between the Minerals Management Service ("MMS"), through its predecessor, the United States Geological Survey ("USGS"), and the State of Louisiana, through representatives of the Louisiana State Mineral Board and the Louisiana Department of Conservation; and (3) the correlative rights of the State of Louisiana and its mineral lessees under Louisiana law, allegedly applicable under 43 U.S.C. § 1333(a)(2)(A), or alternatively, under applicable federal law.

Federal jurisdiction is predicated on 28 U.S.C. §§ 1331, 1361, 2201, and 43 U.S.C. § 1349(a)(3) and (b)(1).

## CURRENT POSTURE

As a preliminary note, the Court finds the existence of a common reservoir to be a disputed issue of fact. However, resolution of that controversy is not material to the disposition of this case.

On May 20, 1986 this Court denied the plaintiffs' motion for a preliminary injunction.[5] Subsequently, the Federal Defend-

---

**3.** For a history of the thirty year dispute surrounding the location of the Louisiana coastline, *see United States v. State of Louisiana,* 446 U.S. 253, 258–59, 100 S.Ct. 1618, 1622–23, 64 L.Ed.2d 196 (1980), *reh. den.* 447 U.S. 930, 100 S.Ct. 3007, 65 L.Ed.2d 1110 (1980).

**4.** The Secretary has delegated the authority to manage oil and gas leasing on the federal offshore continental shelf ("OCS") to the Minerals Management Service ("MMS"). 30 C.F.R. 250.1.

**5.** It found that the plaintiffs alleged two distinct interests: (1) a right to be protected from income lost through the defendants' drainage of hydrocarbons; and (2) a right to be protected against the waste of hydrocarbons by competitive drilling practices. Finding any drainage losses to be compensable with a money judgment, and allegations of waste to be speculative, it declined to enjoin the defendants' production. *See Canal Authorities of the State of Florida v. Callaway,* 489 F.2d 567, 572 (5th Cir.1974) (among prerequisites for preliminary injunction

ants moved for partial summary judgment on two issues: (1) that payments made pursuant to the 1986 amendments to § 8(g) were legislatively intended to compensate Louisiana for drainage claims; and (2) that the parties never entered into a binding agreement concerning regulatory principles.

Samedan, by separate motion, raised the same issues as the Federal Defendants, and additionally sought summary judgment on the plaintiffs' correlative rights claim. This was followed by the Federal Defendants' motion to dismiss drainage claims for lack of subject matter jurisdiction pursuant to Fed.R.Civ.P. 12(b)(2).

Finally, numerous nondispositive motions were filed, including a motion to strike the plaintiffs' exhibits for failure to comply with Fed.R.Civ.P. 56(e). All outstanding motions were consolidated for oral argument on November 10, 1986.

■ Federal Defendants' jurisdictional challenge is mislabeled. The basis for dismissal is that Louisiana's acceptance of payment under the 1986 amendments to the OCSLA constitutes a waiver of any damage claim as a matter of law. In accordance with the basic philosophy of the federal rules, the substance of a 12(b) motion controls over form. 5 Wright & Miller, *Federal Practice and Procedure*, § 1347, n. 99 (1969). Accordingly, we construe this filing as a motion to dismiss for failure to state a claim under Fed.R.Civ.P. 12(b)(6).[6]

## LAW AND ANALYSIS

■ In considering these questions, a preliminary issue was raised by Samedan's motion to strike numerous exhibits attached to the plaintiffs' memorandum in opposition to summary judgment. Samedan does not contest the authenticity of these exhibits, but bases its objection on

the plaintiffs' failure to certify the documents as required by Fed.R.Civ.P. 56(e).

In light of the fact that all of the exhibits referred to were produced, authored, or received by one of the defendants, I find the motion to strike to be meritless. Literal compliance with Rule 56(e) serves no purpose under these circumstances. *Cf. Lawson v. American Motorists Insurance Corporation*, 217 F.2d 724, 726 n. 3 (5th Cir.1954) (idle formality to require immaterial documents to conform to Rule 56(e)). The consideration of these motions incorporated all evidence and arguments advanced by the parties.

### I. THE LEGISLATIVE INTENT

This dispute can be distilled to two issues. Did Congress intend compensation under § 8(g)(2) of the amended OCSLA to incorporate drainage losses? Did Congress also grant the Secretary of the Interior unbridled discretion to refuse to negotiate a unitization or royalty sharing agreement under § 8(g)(3)? The answers must be drawn from both the text and context of the legislation.

Justice Cardozo described statutory construction as a choice between uncertainties. *Burnet v. Guggenheim*, 288 U.S. 280, 288, 53 S.Ct. 369, 372, 77 L.Ed. 748 (1933). However, I believe that a disciplined analysis of this legislation leads to a single conclusion. The starting point in my inquiry is the plain meaning of the statutory language. *See Blue Chip Stores v. Manor Drug Stores*, 421 U.S. 723, 756, 95 S.Ct. 1917, 1935, 44 L.Ed.2d 539 (1975) (Powell, J. concurring). If necessary, a textual interpretation can be measured against legislative history. *See American Trucking Associations, Inc. v. I.C.C.*, 659 F.2d 452, 459 (5th Cir.1981).

■ In applying these principles of statutory construction to the pronouncements of Congress, I am mindful of the need for

is substantial threat of irreparable harm and substantial probability of prevailing on the merits).

**6.** Normally, consideration of a 12(b)(6) motion focuses solely on the allegations in the complaint. However, introduction of matters of public record and entertainment of oral argument is permissible. 5 Wright & Miller, *Federal Practice and Procedure*, §§ 1357 n. 41 and 1364, n. 24–43.

caution in reviewing legislative commentary. *Id.* Undoubtedly, the passage of the 1986 OCSLA amendments was engendered by different, and perhaps inconsistent, legislative motives. That history does not give the Court license to impose its own policy choice. While we are not confined to the statutory language, we are confined by it, and a presumption exists that the legislature intended the plain meaning of its words. Frankfurter, *Some Reflections on the Reading of Statutes,* 47 Colum.L.Rev. 527, 543–44 (1947).

### The Statute

Section 8(g) of the OCSLA governs federal leasing of submerged lands within three miles of a coastal state's seaward boundary. This area is commonly known as the 8(g) zone. Section 8(g) currently provides for the distribution of twenty-seven percent of the revenue derived from federal leasing activity in the 8(g) zone to the contiguous state.[7] Section 3 of the OCSLA, the declaration of policy, indicates that this distribution is intended to mitigate adverse economic and environmental effects related to the development of offshore resources.[8]

Section 8(g)(3) outlines notification requirements when either executive determines that a common reservoir may underlie both state and federal tracts. The section goes on to provide for the division of revenues in such a case by agreement incorporating unitization or royalty sharing.[9]

### The Arguments

The plaintiffs contend that the mandatory division of revenues under § 8(g)(2) is not intended to compensate the states for drainage losses. They argue that the provision of a second revenue sharing mechanism in § 8(g)(3), triggered by a determination that a common pool may exist, would be superfluous if the adverse economic effect described in § 3 encompassed drainage losses.

The plaintiffs' position ignores the permissive nature of the revenue sharing authority established in § 8(g)(3). Although the notification requirements of § 8(g)(3) are cast in mandatory language,[10] the text preceding the revenue sharing

---

7. Paragraph (2) of the amended § 8(g) provides:

 Not withstanding any other provision of this Act, the Secretary shall deposit into a separate account in the Treasury of the United States all bonuses, rents and royalties, and other revenues ... derived from any lease issued after September 18, 1978 of any Federal tract which lies ... within three nautical miles of the seaward boundary of any coastal state[.] Except as provided in paragraph (5) of this subsection,.... the Secretary shall transmit to such coastal State 27 percent of these revenues together with all accrued interest thereon.

8. As amended, § 3 of the OCSLA, 43 U.S.C. § 1332(4)(B) reads:

 "(B) the distribution of a portion of the receipts from the leasing of mineral resources of the outer Continental Shelf adjacent to State lands, as provided under section 8(g), will provide affected coastal States and localities with funds which may be used for the mitigation of adverse economic and environmental effects related to the development of such resources...."

9. § 8(g)(3), 43 U.S.C. § 1337(g)(3), as amended, reads:

 Whenever the Secretary or the Governor of a coastal State determines that a common potentionally hydro-carbon bearing area may underlie the Federal and State boundary, the Secretary or the Governor shall notify the other party in writing of his determination and the Secretary shall provide to the Governor notice of the current and projected status of the tract or tracts containing the common potentially hydro-carbon bearing area. If the Secretary has leased or intends to lease such tract or tracts, the Secretary and the Governor of the coastal state may enter into an agreement to divide the revenues from production of any common potentially hydro-carbon bearing area by unitization or other royalty sharing agreement pursuant to existing law. If the Secretary and the Governor do not enter into an agreement, the Secretary may nevertheless proceed with the leasing of the tract or tracts. Any revenues received by the United States under such an agreement shall be subject to the requirements of Paragraph (2).

10. 43 U.S.C. § 1337(g)(3) reads, in pertinent part:

 "Whenever the Secretary ... determines that [a common reservoir] may underlie the Federal and State boundary, the Secretary ... *shall* notify the other party ... and the Secretary *shall* provide ... notice of the ... status of the tract...." [emphasis added]

provision is clearly permissive.[11] This language invests the Secretary with discretion to enter into agreements pursuant to § 8(g)(3). *See generally Knight Newspapers, Inc. v. United States*, 395 F.2d 353, 357–58 (6th Cir.1968).

A characterization of § 8(g)(3) as discretionary is consistent with the section's restriction of agreements to those formed "pursuant to existing law". Existing law permits the Secretary to enter into unitization agreements to protect federal royalty interests and prevent waste of natural resources.[12] It is not unreasonable to interpret § 8(g)(3) as preserving the Secretary's license to enter into voluntary agreements with the states. The Secretary would have discretion to negotiate such an agreement when advantageous to federal interests.

■ Moreover, a comparison to preamendment § 8(g) gives credence to the view that drainage compensation is incorporated in the § 8(g)(2) scheme. The former version of § 8(g), enacted in 1978, provided that the existence of a common reservoir triggered a duty "to enter into an agreement concerning the disposition of revenues which may be generated by a Federal lease within such area in order to permit their fair and equitable division between the state and federal government." 43 U.S.C. § 1337(g)(2), *amended by* §§ 8002–8004 of the Consolidated Omnibus Budget Reconciliation Act, Pub.L. 99–272, 100 Stat. 147, 148 (1986) [hereinafter, "former § 8(g)"]. If the parties could not agree on a "fair and equitable" division, the Secretary was empowered to proceed with leasing. However, former § 8(g)(4) required that all revenues be retained in a separate account until agreement was reached or the issue resolved by a U.S. District Court.

Because the 1986 amendments preserved the Secretary's express authority to proceed with leasing in the absence of any agreement, the failure to carry the escrow provision over into the current § 8(g)(3) indicates that agreement on revenue sharing is now entirely discretionary. This is consistent with the view that the substitution of the 27%—73% split now mandated in § 8(g)(2) for the "fair and equitable" standard was designed to incorporate drainage compensation.

One of the stated policies of the OCSLA is to make the OCS available "for expeditious and orderly development." 43 U.S.C. § 1332(3). The legislative history of the 1986 amendments indicates that a major goal of Congress was to avoid protracted litigation over the meaning of "fair and equitable."[13] This purpose is inconsistent with plaintiffs' position concerning the meaning of § 8(g)(3). Congressional substitution of the 27%—73% division for the "fair and equitable" standard could not be perceived to avoid litigation if drainage was to be compensated separately.

I recognize that my analysis is predicated on the understanding that the "fair and equitable" standard incorporated drainage losses. Despite plaintiffs' contrary position, I am confident that the history and interpretation of the OCSLA confirm that reliance. The legislative history of the 1978 OCSLA amendments clearly indicates that former § 8(g) was intended to address drainage concerns. The House Report states: "[§ 8(g)] is intended to establish a procedure for the orderly and efficient leasing and development of Federal [OCS] lands contiguous with state tidelands. While the issue of jurisdiction over off-

---

11. "If the Secretary has leased or intends to lease such tract ... the Secretary ... *may* enter into an agreement to divide [production revenues] by unitization or other royalty sharing agreement, pursuant to existing law." [emphasis added] *Id.*

12. Section 5(a) of the OCSLA, 43 U.S.C. § 1334(a) authorizes the Secretary to issue rules "for the prevention of waste and conservation of the natural resources of the [OCS], and the protection of correlative rights[.]" Those correlative rights refer both to the respective rights of

federal lessees and the protection of federal royalty interests from state encroachment. *See* 30 C.F.R. 250.50(a). Section 5(a) was unaffected by the 1986 amendments to the OCSLA.

13. No satisfactory division of 8(g) revenues was ever achieved under the "fair and equitable" standard, despite lengthy litigation. At the end of fiscal year 1985, $6.1 billion remained in escrow, awaiting resolution of the claims of seven states. H.R.Rep. No. 300, 99th Cong., 2d Sess. 547 (1985) U.S.Code Cong. & Admin.News 1986, p. 42.

shore lands has been resolved by the U.S. Supreme Court [,] ... the problem of drainage of state resources by a lessee operating on the [OCS] has not been so resolved." H.R.Rep. No. 590, 95th Cong., 2d Sess. 144 (1978), *reprinted in* 1978 U.S.Code Cong. & Admin.News 1450, 1550.

Further evidence that § 8(g) was intended to address drainage from state lands is found in comments by then Secretary of the Interior Cecil D. Andrus. In recommending the "fair and equitable" division of revenue instead of a proposed joint federal-state leasing of 8(g) acreage, Secretary Andrus observed:

> We favor a provision which gives coastal states fair and equitable compensation for oil and gas which is produced through wells in the federal areas adjacent to them, but *which is derived from state lands.* We believe, however, that special care must be taken not to undermine the Secretary's fundamental responsibilities under the statute and to be as clear as possible about the process under which the State would seek compensation. Thus, in the substitute section we are providing, the references to "joint leasing" have been removed and *its principal purpose, compensation for the resource taken from state lands,* more clearly brought into focus.

*Id.* at 219, 220, 1978 U.S.Code Cong. & Admin.News at 1625 [emphasis added].

Additionally, the cases interpreting "fair and equitable" have indicated that drainage is incorporated under the aegis of § 8(g) compensation. *State of Texas v. Secretary of the Interior,* 580 F.Supp. 1197, 1199–1200 (E.D.Texas 1984); *State of Louisiana v. Watt,* No. 79–2965–I(2) (E.D.La. October 3, 1984).

Louisiana now claims that its suit under the former § 8(g) did not include a claim for drainage compensation. Accordingly, it argues that the compromise of previous litigation by enactment of the 1986 amendments cannot affect its claim for drainage compensation. I disagree with both contentions.

Although the State's complaint in the previous litigation did not specify a drainage claim, responses to interrogatories clearly indicate that the State contended that drainage was an element of its recovery under § 8(g). Louisiana also argued that former § 8(g) compensation encompassed drainage losses in an *amicus curiae* filing in the appeal of the *State of Texas* litigation.[14]

Regardless of Louisiana's position, I cannot regard Congress' intent to be defined by the pleadings filed in litigation compromised by the 1986 amendments. This argument would lead to the conclusion that Congress intended a different interpretation for each state which sued under former § 8(g).[15] Additionally, Congress undoubtedly intended the 1986 amendments to compromise any potential claims by the four states which did not file suits under former § 8(g).[16]

Section 8(g)(3) requires that any proceeds generated under a revenue sharing agreement be subjected to the 27%–73% distribution provision of § 8(g)(2). Presumably, the terms of any voluntary § 8(g)(3) revenue sharing across the State/Federal boundary would compensate for drainage losses. Because I interpret the division mandated by § 8(g)(2) to incorporate drainage compensation, it might appear that voluntary § 8(g)(3) revenue sharing affords the states a double recovery.

---

**14.** Entitled *State of Texas v. Hodel,* Nos. 84–2422, 85–9072 (5th Cir.1985), the appeal was dismissed as moot on May 5, 1986 because of the passage of the 1986 amendments. In the corresponding district court action, Civ. A. No. B–79–476–CA (E.D.Tex.), the Court vacated its previously entered judgment and dismissed the case with prejudice on August 11, 1986 pursuant to the stipulation of the parties.

**15.** Texas, Louisiana, and Alaska sought judicial resolution of the "fair and equitable" standard. Entitled *State of Alaska v. United States, et al.,* C.A. A–85–502 (D.Ak.1985), the Alaska litigation was dismissed on July 31, 1986 pursuant to the stipulation of the parties.

**16.** California, Alabama, Mississippi, and Florida were also eligible to receive disbursements under the provisions of § 8(g).

However, drainage is only a single element of § 8(g) compensation. *See State of Texas,* 580 F.Supp. at 1221. It is entirely plausible that Congress simply believed that factoring out drainage from the 27% figure posed too much of an obstacle to the operation of a voluntary revenue sharing scheme.

Through § 8(g), Congress evidenced a policy regarding the coastal states' remedy for resource drainage by federal lessees on the OCS. That remedy is limited to participation in § 8(g)(2) revenue sharing.

## II. THE POLICY AGREEMENT

The plaintiffs allege that a 1975 policy agreement concerning regulatory guidelines now binds the United States. The plaintiffs contend that this agreement is evidenced by internal memoranda generated by both parties and a history of regulation consistent with the terms of the alleged agreement.

The alleged policy agreement involves the creation of a buffer zone along the Supreme Court decree line, the exchange of drilling permits for wells authorized within the zone, and the adoption of well spacing requirements in the zone. Additionally, under the alleged policy agreement the party with the largest share of any unit formed within the zone would have the right to set the unit production rates.

These conditions, established in meetings between the U.S. Geological Survey and the Louisiana Department of Conservation, are outlined in a September 19, 1975 internal State memorandum. Identical conditions are incorporated in two internal federal memoranda prepared in 1980. Samedan's operation in West Delta Block 18 violates these terms.

The plaintiffs seek injunctive relief, mandating federal enforcement of the alleged policy agreement. In particular, the plaintiffs contend that the provision relating to the setting of production rates implicitly incorporates a duty to negotiate unitization agreements in good faith.

The plaintiffs contend that factual disputes concerning both the formation of the policy agreement and MMS adherence to its guidelines make this claim inappropriate for summary judgment. I disagree. Fed. R.Civ.P. 56(c) requires disputed factual issues be both genuine and material to defeat a motion for summary judgment. *See generally* Schwarzer, *Summary Judgment Under the Federal Rules: Defining Genuine Issues of Material Fact,* 99 F.R.D. 465. The factual dispute raised by the plaintiffs is clearly not material to the disposition of this claim.

### A GENUINE DISPUTE?

The documents offered by the plaintiff do not indicate the existence of any binding MMS policy. The State's September, 1975 memorandum is entitled "preliminary" and characterizes the outlined regulatory conditions as "tentative possible solutions." The U.S. Government memoranda dealing with this subject term the scheme as "unofficial." The plaintiffs advance no other evidence, but assert that at trial they will develop proof of a mutual course of conduct consistent with the conditions of the alleged agreement.

The defendants point out that the plaintiffs have not offered any direct evidence of MMS implementation of the regulatory conditions outlined in the 1975 memorandum.[17] The plaintiffs concede that these terms have never been promulgated by the MMS as published rulemaking.

■ It is clear that effective use of Rule 56 requires us to refrain from defining factual issues by speculation. *Schwarzer,* 99 F.R.D. at 466. Yet *Fontenot v. Upjohn Co.,* 780 F.2d 1190, 1192 (5th Cir.1986), teaches that inferential evidence can suffice to defeat a motion for summary judgment.

The plaintiff's evidence only marginally raises a factual dispute concerning the existence of an MMS policy as defined in the

---

17. The MMS implements regulation through formal Orders, issued by the Director, which are directed at specific areas and operations. 30 C.F.R. § 250.2(ee). *See* 30 C.F.R. §§ 250.10 (jurisdiction of director), § 250.16 (authority to set production rate), § 250.17 (authority to set well spacing), § 250.50 (authority to unitize).

1975 memorandum. However, courts ordinarily indulge in presumptions favorable to a nonmovant. *Securities and Exchange Commission v. Spence & Green Chemical Company,* 612 F.2d 896, 900 (5th Cir.1980). Accordingly, I will assume that a genuine factual dispute exists.

A MATERIAL ISSUE?

To preclude summary judgment, a genuine factual dispute must involve a controlling issue. *Anderson v. Liberty Lobby, Inc.,* —— U.S. ——, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). In this case, the factual dispute concerns MMS adoption of the alleged policy agreement. However, I find that proof of a history of consistent regulation cannot entitle the plaintiffs to prevail.

■ Clearly, the conditions of the 1975 memorandum are designed to "implement, interpret, or prescribe law or policy." *See Batterton v. Marshall,* 648 F.2d 694, 700 (D.C.Cir.1980). The authority to promulgate rules consistent with those outlined in the policy agreement was delegated to the Secretary in § 5 of the OCSLA, 43 U.S.C. § 1334. Thus, MMS adoption of the terms of the 1975 memorandum would constitute rulemaking under the aegis of the Administrative Procedures Act ("APA"), 5 U.S.C. §§ 551 *et seq.*[18]

However, even if the MMS conceded the 1975 memorandum to accurately reflect its regulatory intentions, those conditions could not be enforced against Samedan. The APA requires agencies to publish certain regulations and guidelines as a prerequisite to enforcement. Agencies must publish in the Federal Register "substantive rules of general applicability adopted as authorized by law, and statements of general policy or interpretations of general applicability formulated and adopted by the agency." 5 U.S.C. § 552(a)(1)(D).

The conditions outlined in the 1975 memorandum constitute the substance of a regulation imposing specific obligations upon private interests in mandatory terms. As such, these requirements must be either published in the Federal Register or reasonably available and incorporated by reference. *See Appalachian Power Company v. Train,* 566 F.2d 451, 455 (4th Cir. 1977). The terms of the 1975 memorandum have never been so published.

5 U.S.C. § 552(a)(1) provides that "a person may not in any manner ... be adversely affected by a matter required to be published in the Federal Register and not so published." [19] MMS adherence to the terms of the 1975 memorandum would adversely affect Samedan's West Delta operations. Accordingly, the MMS could not invoke the terms of the unpublished policy in regulating Samedan's operations.

Material factual issues are those which entitle a nonmovant to prevail if favorably resolved. *Houston North Hospital Properties v. Telco Leasing, Inc.,* 688 F.2d 408, 410 (5th Cir.1982). As outlined above, proof of a course of conduct consistent with the terms of the alleged 1975 policy agreement could not support a verdict for plaintiff. Accordingly, summary judgment is appropriate.

## III. THE CORRELATIVE RIGHTS CLAIM

The plaintiffs allege that the drilling and production of Samedan's wells has deprived the plaintiffs of a reasonable opportunity to recover an equitable share of the potentially common pool. The plaintiffs contend that Louisiana law, or alternatively, federal common law, entitles them to an injunction limiting Samedan's production.

---

**18.** 5 U.S.C. § 551(4) defines "rule" as "an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy[.]" This definition includes nearly every statement an agency may make. *Batterton,* 648 F.2d at 700.

**19.** The Court is aware that actual and timely notice of an unpublished policy or regulation

will bind a party. *Timber Access Industries Co., Inc. v. United States,* 553 F.2d 1250, 1255 (Cl.Ct. 1977); *Nason v. Kennebec County CETA,* 646 F.2d 10, 19 (1st Cir.1981). However, a review of the record reveals no allegation that Samedan was aware of MMS implementation of the terms of the 1975 memorandum as a policy.

*The Applicable Law*

■ I find that federal law defines Samedan's production rights on the federal OCS.

The OCSLA extends the "Constitution and laws and civil and political jurisdiction of the United States" to the subsoil and seabed of the OCS. 43 U.S.C. § 1333(a)(1). To fill the substantial gaps in the coverage of federal law, the OCSLA provides for the adoption of the laws of a state adjacent to the Federal OCS "[t]o the extent that they are applicable and not inconsistent with ... other Federal laws and regulations of the Secretary" as surrogate federal law. 43 U.S.C. § 1333(a)(2). *See Rodrigue v. Aetna Casualty and Surety Co.*, 395 U.S. 352, 356–57, 89 S.Ct. 1835, 1837–38, 23 L.Ed.2d 360 (1969). State law is only introduced to the OCS in the absence of relevant Federal law. *Id.* at 357–58, 89 S.Ct. at 1838; *Continental Oil Co. v. London Steam-Ship Owners Mutual Insurance Ass'n.*, 417 F.2d 1030, 1036 (5th Cir.1969).

Congress has provided controlling federal law in this context. The 1986 amendments to the OCSLA address drainage claims across the state and federal boundary line. Additionally, the OCSLA delegates the power to prescribe rules pertaining to OCS production to the Secretary of the Interior. 43 U.S.C. § 1334(a). This power includes a mandate "to provide for the prevention of waste and conservation of the natural resources of the [OCS], and the protection of correlative rights therein[.]" *Id.* Pursuant to this delegation, the Secretary promulgated regulations vesting power to control production rates and well spacing in the Director of the MMS. *See supra* note 17. As described above, the Director exercises his authority through the issuance of individual OCS Orders targeting specific areas and operations.

This pervasive federal regulatory scheme displaces state law relative to correlative rights on the federal OCS.

*Applying Federal Law*

■ The Secretary has defined "correlative rights" as the right of adjacent lessees to be afforded an equal opportunity to explore for, develop, and produce hydrocarbons without waste. 30 C.F.R. § 250.2(i). "Waste" is defined as the physical waste of hydrocarbons, the dissipation of reservoir energy, and the reduction of the amount of ultimately recoverable hydrocarbons. 30 C.F.R. § 250.2(qq). Notably, economic losses inherent in the cost of drilling wells to exploit a common pool are excluded from this definition.

Federal law embodies the "rule of capture," as tempered by restrictions on waste. To prevail on a correlative rights claim, the plaintiffs need demonstrate waste. This can be accomplished by proving either actual waste by Samedan or the plaintiffs' inability to produce from a common pool without improperly dissipating reservoir energy. To preclude summary judgment, the plaintiffs need raise a genuine issue of material fact concerning this controlling issue. *Anderson*, 106 S.Ct. at 2510.

The plaintiffs have made no showing that Samedan's operations denied the state's lessees an equal opportunity to produce hydrocarbons in West Delta Block 18. The plaintiffs' contentions concerning the cost of drilling additional wells to recover a ratable portion of the reservoir are immaterial. The doctrine of correlative rights simply does not incorporate these expenses as "waste." This action is founded solely on proof of intentional or negligent waste of hydrocarbons or reservoir energy.

This Court denied a motion for a preliminary injunction in this case, characterizing the plaintiffs' evidence concerning waste as speculative. The nature of that evidence is unchanged. At issue now is whether the plaintiffs' evidence is sufficient to create a genuine factual issue.

When evidence presented in a motion is subject to conflicting interpretations, summary judgment is ordinarily improper. *See Braniff v. Jackson Ave.-Gretna Ferry, Inc.*, 280 F.2d 523, 526 (5th Cir.1960). However, the evidence advanced must be substantial. *Firemen's Mutual Insurance Co. v. Aponaug Mfg. Co.*, 149 F.2d 359, 362 (5th Cir.1945); 10A Wright, Miller & Kane, *Federal Practice and Procedure* § 2725 n.

31 (1983). A nonmovant is not entitled to hold back his evidence until trial. *See Bruce Construction Corp. v. United States for use of Westinghouse Electric Supply Co.*, 242 F.2d 873, 874–75 (5th Cir. 1957). The amount of evidence necessary to raise a genuine issue of fact is enough "to require a jury or judge to resolve the parties' differing versions at trial." *First National Bank of Arizona v. Cities Services Co.*, 391 U.S. 253, 288–89, 88 S.Ct. 1575, 1592, 20 L.Ed.2d 569 (1968).

 There is absolutely no evidence that Samedan's operations are themselves wasteful. However, the plaintiffs' experts testified that the coordinated exploitation of the allegedly common reservoir *might* enhance the amount of hydrocarbons ultimately recovered. This ambiguous evidence is hardly substantial, and could not conceivably carry the plaintiffs' burden of proving their case by a preponderance of the evidence.

This Court has weighed a number of factors in evaluating this motion. These factors include the value of additional examination of the plaintiffs' witnesses, and the benefit of further developing a factual issue at trial. Considering the full record and the foregoing legal principles, I find summary judgment to be appropriate on this issue.

## IV. THE MOTION TO PERMIT LIMITED DISCLOSURE OF PROTECTED MATERIALS

 MGF Oil Corporation and MGF 82 Ltd. (collectively "MGF") are current record interest owners in several state leases in West Delta Block 18. MGF obtained this interest by virtue of a 1982 assignment from Cashco. MGF is not a party to this suit.

In May, 1986 this Court issued a stipulated protective order pursuant to Fed.R. Civ.P. 26(c). The order protects confidential research and commercial information obtained in the discovery process from disclosure. Paragraph 2 of the order details persons entitled to receive confidential information. These include the parties, counsel, and employees and witnesses as necessary to prepare for trial. Paragraph 2(e) provides for disclosure to "[a]ny person designed [sic] by the Court in the interest of justice, upon the motion of any party and upon such terms as the Court may deem proper[.]" Persons receiving information subject to the protective order are required to execute a written assurance consenting to the Court's *in personam* jurisdiction.

Subsequently, the Louisiana Office of Conservation scheduled a public hearing to develop factual testimony concerning drainage and waste in West Delta Block 18. The State contended that this hearing was necessary to permit the Commissioner of Conservation's technical staff to make formal findings. The defendants expressed concern that a public hearing would result in the unauthorized disclosure of protected information. In compromise, the parties stipulated that a closed hearing would be conducted, but that any findings would be accorded the same legal effect in this case as if the hearing had been open. The parties agreed that actual notice of the hearing date was to be afforded all parties determined to have an interest. MGF was a signatory to this stipulation.

MGF was notified of the scheduled hearing, and attempted to attend. Samedan objected to the presence of MGF, although both MGF representatives had executed written assurances in compliance with the protective order. To avoid impeding the progress of the hearing, MGF withdrew, reserving its right to receive a transcript of the proceedings through the plaintiffs' motion.

This dispute invokes conflicting rights. Nondisclosure of the hearing transcript to MGF might constitute a due process violation in that MGF may be bound to any legal effect of the proceedings. However, disclosure of protected materials to MGF, a nonlitigant, is outside the scope of the original order.

In their memorandum supporting this motion, the plaintiffs concede that MGF's execution of the stipulation binds them to the terms of the protective order. The

order clearly limits MGF's access to confidential information to that permitted by this Court "in the interests of justice." A review of the terms of the order reveals that its unmistakable intent is to prevent disclosures other than those necessary to prepare the case for trial. MGF has no discernible function in the litigation of this claim. Accordingly, MGF should have been aware that it could not qualify to receive disclosure of protected material under Paragraph 2(e) of the order. Moreover, I find any intrusion on the due process rights of MGF to be minimal. MGF does not seek any input into the Commissioner of Conservation's determination. It simply seeks release of a transcript of the hearing.

The plaintiffs contend that Samedan's acquiescence to the notice of MGF as an interested party constitutes a waiver of the disclosure limitations of the protective order. In light of the countervailing considerations, I find this argument less than compelling.

### JUDGMENT

For the written reasons assigned in the ruling of this date,

IT IS ORDERED that:

1. The motion of defendant Samedan Oil Corp. to strike exhibits is DENIED.

2. The motion for partial summary judgment filed by defendants the United States, the Secretary of the Interior, and the Director of the Minerals Management Service is GRANTED.

3. The motion for summary judgment filed by defendant Samedan Oil Corp. is GRANTED.

4. The motion of defendants the United States, the Secretary of the Interior, and the Director of the Minerals Management Service to dismiss for lack of subject matter jurisdiction is construed as a motion to dismiss for failure to state a claim, and is hereby GRANTED.

5. The motion of the plaintiffs, the State of Louisiana, Cashco Oil Co., Seneca Resources Corp., and Pelto Oil Co., to permit disclosure of protected materials to MFG Corporation is DENIED.

6. All other motions are MOOT.

7. This action is DISMISSED WITH PREJUDICE to all rights of plaintiff and plaintiff-intervenors.